CHIMICLES & TIKELLIS LLP
Nicholas E. Chimicles
Pa. I.D. No. 17928
Steven A. Schwartz
Pa. I.D. No. 50579
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
Telephone:     (610) 642-8500
Facsimile      (610) 649-3633

LIONEL Z. GLANCY
MICHAEL GOLDBERG
GLANCY & BINKOW LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone:     (310) 201-9150
Facsimile:     (310) 201-9160

Attorneys for Plaintiff The Winer Family Trust

UNITED STATES DISTRICT COURT
DISTRICT OF PENNSYLVANIA

**FILED JUL 2 4 2003**

| | |
|---|---|
| THE WINER FAMILY TRUST, Individually And On Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> MICHAEL QUEEN, DENNIS BLAND, THOMAS MCGREAL, JOSEPH W. LUTER, IV, MICHAEL H. COLE, SMITHFIELD FOODS, INC. and PENNEXX FOODS, INC., <br><br> Defendants. | No. 03- 4318 <br><br> CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND VIOLATIONS OF  FEDERAL SECURITIES LAWS <br><br> **JURY TRIAL DEMANDED** |

Plaintiff, by its attorneys, for its Class Action Complaint, alleges the following upon

personal knowledge as to itself and its own acts, and upon information and belief based upon the

investigation of plaintiff's attorneys as to all other matters. The investigation includes the

thorough review and analysis of public statements, publicly filed documents of Pennexx Foods,

Inc. ("Pennexx" or the "Company"), press releases, news articles and the review and analysis of

accounting rules and related literature. Plaintiff believes that further substantial evidentiary

support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## SUMMARY OF ACTION

1.    This is a securities class action on behalf of public investors who purchased the

securities of Pennexx Foods, Inc. during the period from February 8, 2002 through June 12, 2003

(the "Class Period"). Plaintiff complains of a fraudulent scheme and deceptive course of

business that injured purchasers of Pennexx stock during the Class Period.

2.    Pennexx (formerly Pinnacle Foods, Inc.) is a Pennsylvania corporation that

provides "case-ready" meat – prepackaged and labeled meat products ready for retailers' store

shelves without further processing or packaging – to customers in the Northeastern United States.

The Company cuts, packages, processes and delivers case-ready beef, pork, lamb and veal.

3.    In June 2001, Smithfield Foods, Inc. ("Smithfield Foods"), a world-wide

producer and distributor of pork and processed meat products, acquired a 50% interest in

Pennexx in a deal that included, among other things, Smithfield purchasing 13,003,494 shares of

the Company's common stock and extending a $30 million revolving line of credit to Pennexx.

The revolving line of credit was secured by a lien on all of Pennexx's assets, including

after-acquired inventory and accounts receivable (the "Credit Agreement"). Additionally,

Smithfield Foods placed two of its executive officers on the Pennexx Board of Directors: Joseph

W. Luter, IV, executive vice president of Smithfield Packing Company (and son of Smithfield

2

Foods' Chairman and Chief Executive Officer Joseph W. Luter, III) and Michael H. Cole, associate general counsel of Smithfield Foods.

4.     The acquisition of Pennexx provided two important elements to Smithfield Foods' strategy for "conversion from a commodity-based company to a global food company": (1) an entry for the Virginia-based Smithfield Foods into the "critical" Northeastern markets served by Pennexx, and (2) the addition of beef, lamb and veal expertise and processing capabilities.

5.     Throughout the Class Period, defendants artificially inflated the price of Pennexx stock by disseminating materially false and misleading statements concerning the Company's financial performance, business operations, and prospects.  Defendants accomplished this scheme by issuing materially false and misleading public statements concerning, among other things: (i) the Company's chronic liquidity problems; (ii) Pennexx's actual prospects for growth and increased market penetration; (iii) the effect of Pennexx's limited processing and distribution capabilities on the Company's ability to take advantage of increased demand and expansion in the case-ready meat industry; (iv) that defendants pressured the former CFO to under-report losses for second quarter 2002 to the SEC; (v) Pennexx's danger of defaulting under the Credit Agreement; and (vi) litigation involving the Company's Pottstown meat-processing facility – which resulted in Pennexx being ordered by the court to vacate the premises.

6.     Additionally, Pennexx's quarterly and annual earnings reports filed with the SEC on Form 10-Qs and 10-Ks, respectively, were also false and misleading as they repeated the misleading financial results published in the Company press releases described herein, overstated the Company's business prospects and downplayed, among other things, the Company's chronic liquidity problems during the periods being reported.

3

7.     Defendant Smithfield Foods, which owned 50 percent of Pennexx's stock, placed two Smithfield Foods' executives on the Pennexx Board of Directors and was a controlling person of Pennexx that failed to disclose the Company's problems throughout the Class Period. Moreover, even after granting Pennexx a waiver under the Credit Agreement, Smithfield Foods failed to disclose the magnitude of Pennexx's liquidity crisis, insufficient demand to continue as a "going concern," or that the Company was in danger of default under the Credit Agreement.

8.     Pennexx's financial problems were revealed on June 12, 2003, when – after defendants repeatedly claimed there was "increasing demand" for Pennexx products which caused Pennexx to move into a new facility that is four times the size of its previous facility – the Company shocked the market by disclosing that Pennexx had been declared in default under the Credit Agreement with Smithfield Foods.  By the close of trading that day, Pennexx stock dropped more than fourteen percent (14%) as a result of this shocking news.

9.     Smithfield Foods subsequently sold all of the tangible property assets of Pennexx to a corporation owned or controlled by Smithfield Foods, terminating Pennexx's ability to continue operations.

## JURISDICTION AND VENUE

10.     The claims asserted arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act" or the "1934 Act"). Jurisdiction is conferred by §27 of the 1934 Act.  Venue is proper pursuant to §27 of the 1934 Act as defendant and/or the individual defendants conduct business in and the wrongful conduct took place in this District.

## THE PARTIES

11.     Plaintiff The Winer Family Trust purchased Pennexx publicly traded securities as

4

detailed in the attached Certification and was damaged thereby.

12.     Defendant Pennexx is a corporation organized under the laws of Pennsylvania
with its principal place of business located at 5501 Tabor Avenue, Philadelphia, Pennsylvania
19120. Pennexx was established in 1999, and until February 8, 2002, operated under the name
Pinnacle Foods, Inc. Pennexx provides case-ready meat products to customers in the
Northeastern United States.

13.     Defendant Michael Queen was during the Class Period, and at times relevant
hereto, the Chief Executive Officer of Pennexx.

14.     Defendant Dennis Bland was during the Class Period, and at times relevant
hereto, the Chief Operating Officer of Pennexx.

15.     Defendant Thomas McGreal was during the Class Period, and at times relevant
hereto, Vice President of Sales of Pennexx.

16.     Defendant Smithfield Foods, Inc. is a Virginia corporation that produces,
processes and markets a variety of fresh pork and processed meat products, with operations in the
United States and throughout the world.  Smithfield Foods' corporate headquarters are located at
200 Commerce Street, Smithfield, Virginia 23430.  As the owner of 13,003,494 shares of
Pennexx's common stock during the Class Period and by virtue of its employment of two of
Pennexx's appointed directors on the Pennexx Board of Directors, Smithfield Foods was at times
relevant hereto a controlling person of Pennexx.

17.     Defendant Joseph W. Luter, IV, was at times relevant hereto a Director of
Pennexx. During the Class Period, Defendant Luter served as executive vice president of
Smithfield Packing Company – a subsidiary of Smithfield Foods – and as one of Smithfield

5

Foods' designees to the Pennexx Board of Directors. By virtue of his position as a Director of

Pennexx, Defendant Luter was under a continuing duty to direct and control the operations of

Pennexx, to exercise due care and diligence in those operations, and to oversee and review all

corporate operations, including the filing of documents with the SEC and the making of public

statements.

18.     Defendant  Michael H. Cole was at times relevant hereto a Director of Pennexx.

During the Class Period, Defendant Cole served as associate general counsel of Smithfield Foods

and as one of Smithfield Foods' designees to the Pennexx Board of Directors. By virtue of his

position as a Director of Pennexx, Defendant Cole was under a continuing duty to direct and

control the operations of Pennexx, to exercise due care and diligence in those operations, and to

oversee and review all corporate operations, including the filing of documents with the SEC and

the making of public statements.

19.     Defendants Queen, Bland, McGreal, Luter and Cole are referred to herein as the

"Individual Defendants."

20.     As officers, directors and/or controlling persons of a publicly-held company

whose common stock is registered with the SEC under the Exchange Act and traded on the New

York Stock Exchange, Smithfield Foods and the Individual Defendants had a duty to promptly

disseminate accurate and truthful information with respect to the Company's operations, finances,

financial conditions, and present and future business prospects, to correct any previously issued

statement from any source that had become untrue, and to disclose any trends that would

materially affect earnings and the present and future operating results of Pennexx, so that the

market price of the Company's publicly traded securities would be based upon truthful and

accurate information.

**21.**     During the Class Period, defendant Smithfield Foods and the Individual

Defendants were privy to confidential and proprietary information concerning Pennexx, its

operations, finances, financial condition, products, and present and future business prospects.

Because of his possession of such information, defendant Smithfield Foods and the Individual

Defendants knew or, with deliberate recklessness, disregarded that the adverse facts specified

herein had not been disclosed to and were being concealed from the public.  Because of their

Board membership and executive and managerial positions with Pennexx, Smithfield Foods and

the Individual Defendants had access to adverse material non-public information about Pennexx's

operations, finances, financial condition, products, inventories and present and future business

prospects.  They had such access via internal corporate documents, conversations and

connections with other corporate officers and employees, attendance at management and Board

of Directors meetings and committees thereof, and via reports and other information provided to

them in connection therewith.  Because of their possession of such information, Smithfield Foods

and the Individual Defendants knew or, with deliberate recklessness, disregarded the fact that the

adverse facts specified herein had not been disclosed to and were being concealed from the

public.

**22.**     Smithfield Foods and the Individual Defendants, because of their stock ownership

and/or positions of control and authority as officers and directors of the Company, were able to

and did control the contents of the various quarterly reports, SEC filings, press releases and

presentations to securities analysts pertaining to the Company.

**23.**     Smithfield Foods and the Individual Defendants were provided with copies of

7

Pennexx's management reports, press releases and SEC filings. Armed with, and in control of such information, Smithfield Foods and the Individual Defendants granted interviews to newspaper reporters. The newspaper articles based on those interviews, as well as the Company's other publicly disseminated information are alleged herein to have been materially misleading to the investing public. Significantly, Smithfield Foods and the Individual Defendants had the ability and opportunity to either prevent their dissemination in the first place or to have caused them to be corrected shortly after their dissemination. As a result, Smithfield Foods and the Individual Defendants were responsible for the accuracy of the public reports and releases detailed herein as "group published" information, and are therefore responsible and liable for the representations contained therein.

24.    Each of the Defendants is liable as a direct participant with respect to the wrongs complained of herein. In addition, Smithfield Foods and each of the Individual Defendants, by reason of their stock ownership and/or status as officers and directors of Pennexx were a "controlling person" within the meaning of Section 20 of the Exchange Act and had the power and influence to cause Pennexx to engage in the unlawful conduct complained of herein. Because of their positions of control, Smithfield Foods and the Individual Defendants were able to and did, directly or indirectly, control the conduct of Pennexx's business, the information contained in its filings with the SEC, and the public statements about its business.

25.    During the Class Period, Defendants, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to misrepresent the results of Pennexx's operations, and to conceal adverse material information regarding the finances, financial condition, and results of operations of Pennexx as specified herein. Defendants

8

employed devices, schemes, and artifices to defraud, and engaged in acts, practices, and a course of conduct, as herein alleged, in an effort to increase and maintain an artificially high market price for Pennexx common stock. These activities included the formulating, making, and/or participating in the making of untrue statements of material facts, and the omission to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Such activities operated as a fraud or deceit upon Plaintiffs and the other members of the Class.

## CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Pennexx publicly traded securities (the "Class") on the open market during the Class Period. Excluded from the Class are defendants, directors and officers of Pennexx and their families and affiliates.

27.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

28.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether the 1934 Act was violated by defendants;

(b) Whether defendants omitted and/or misrepresented material facts;

(c) Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and

9

(d) Whether defendants knew or recklessly disregarded that their statements were false and misleading.

## SUBSTANTIVE ALLEGATIONS

29.     During the Class Period, each of the Individual Defendants occupied positions as top executives and/or directors of Pennexx and were privy to non-public information concerning the Company. Each of them knew of the adverse facts specified herein. Pennexx's press releases, corporate reports to shareholders and filings with the SEC were each group-published documents for which each defendant is equally responsible.

30.     Each of the Individual Defendants, Pennexx and Smithfield Foods are liable in that they inflated the price of Pennexx stock by making false and misleading statements and omitting material adverse information. The defendants' wrongful course of business (i) artificially inflated the price of Pennexx' stock during the Class Period; (ii) deceived the investing public, including plaintiff and other Class members, into acquiring Pennexx securities at artificially inflated prices; and (iii) permitted Pennexx to grow and benefit economically from the wrongful course of conduct.

31.     Defendants knew that by concealing Pennexx's true financial results they could foster the perception in the business community that Pennexx was a "growth company," *i.e.,* the only way they could post the revenue and earnings per share ("EPS") growth claimed by defendants. Pennexx financial results were falsified by defendant's public statements and quarterly reports filed with the SEC filings which understated the Company's losses.

### Background to the Class Period

32.     Pennexx is a corporation organized under the laws of Pennsylvania, with its

10

principal place of business located at 5501 Tabor Avenue, Philadelphia, Pennsylvania 19120.

Pennexx provides case-ready beef, pork, lamb and veal products to customers in the Northeastern

United States. From its formation in 1999 until February 8, 2002, Pennexx operated under the

name Pinnacle Foods, Inc.

     **33.**     On April 25, 2001, defendant Smithfield Foods issued a press release announcing

the planned acquisition of a 50% stake in Pennexx (the "Smithfield Transactions"). The press

release stated in part:

> Smithfield Foods' Stake in Pinnacle Foods Grows Northeastern Case-Ready
> Business

>     SMITHFIELD, Va., April 25 /PRNewswire/ -- **Smithfield Foods, Inc.
> (NYSE: SFD) today announced another transaction to build its case-ready
> meat business in the Northeast United States.** (Emphasis added.)

>     By acquiring a stake in Pinnacle Foods, Inc. (OTC: PFOD), a provider of case-
> ready meat (pork, beef, lamb and veal) to retail supermarkets in the Northeast,
> Smithfield is taking advantage of the synergies initially created by the recently-
> announced agreement to purchase Moyer Packing Company last week. The
> combined distribution capabilities of the three companies will accelerate
> Smithfield's efforts in the critical Northeast market. With square footage at a
> premium, the company believes that supermarkets in New York and throughout
> the Northeast are prime candidates for case-ready meat products.

>     With expected sales of about $30 million for 2001, Pinnacle has headquarters
> and meat packing facilities in Pottstown, Pa.

>     The leader in the case-ready market, Smithfield Foods sold about 75 million
> pounds of case-ready pork to food retailers in fiscal 2001, more than three times
> the volume of the prior year.

>     Smithfield Foods signed an agreement in principle to acquire up to 13.5 million
> shares, or 50 percent of the outstanding common shares of Pinnacle Foods, for a
> total purchase price of $6 million. The agreement also calls for Smithfield Foods
> to provide a $30 million revolving line of credit to Pinnacle for working capital
> and other purposes.

Over the last 25 years Smithfield Foods has delivered a 27 percent average annual compounded rate of return to shareholders. With annual sales of $5.2 billion, the company is the leading processor and marketer of fresh pork and processed meats in the United States, as well as the largest producer of hogs. For more information, please visit www.smithfieldfoods.com .

**34.**     Approximately four weeks later, an article profiling Smithfield Foods

appeared in the June 20, 2001, issue of *The National PROVISIONER*, a trade publication for the

meat, poultry and prepared-foods processing industry. The article described how "Smithfield

Foods has latched onto case ready in a big way in line with its new growth strategy," and noted

that "case-ready products represent a key piece in the distribution program of Smithfield Foods

conversion from a commodity-based company to a global food company. ..." *The National*

*PROVISIONER* article also described Smithfield Foods' acquisition of Pennexx as providing an

entry into the Northeastern supermarkets carrying Pennexx's case-ready pork, beef, lamb and

veal.

**35.**     On June 28, 2001, Smithfield Foods issued a press release announcing that

it had completed the acquisition of a 50% stake in Pennexx. The acquisition of Pennexx

provided two important elements to Smithfield Foods' strategy for "conversion from a

commodity-based company to a global food company": (1) an entry for the Virginia-based

Smithfield Foods into the "critical" Northeastern markets served by Pennexx, and (2) the

addition of beef, lamb and veal expertise and processing capabilities. The June 28, 2001, press

release stated in part:

> This is Smithfield Foods' second transaction in the last week to accelerate its case-ready business in the Northeast. Smithfield will combine its distribution capabilities with Pinnacle and recently-acquired Moyer Packing Company to offer better service and a greater variety of pre-priced, pre-packaged case-ready products to food retailers. Pinnacle produces pork, beef, lamb and veal; Moyer is

12

a beef processor. Pinnacle and Moyer are based in Pennsylvania.

Pinnacle expects sales of about $60 million this year. The agreement also calls for Smithfield Foods to provide a $30 million revolving line of credit to Pinnacle for working capital and other purposes.

A leader in the case-ready market, Smithfield Foods sold about 75 million pounds of case-ready pork to food retailers in fiscal 2001, more than three times the volume of the prior year.

36.      On July 9, 2001, Pennexx filed a Form 10SB12G Registration Statement with the SEC. The Registration Statement describes the acquisition of the 50% interest in Pennexx by Smithfield Foods, and acknowledged that Pennexx (then still known as Pinnacle) needed substantial additional capital to maintain liquidity. Under a section titled "Smithfield Transactions," the Registration Statement, in pertinent part, stated the following:

Pinnacle believes it enjoys a strategic advantage as a result of its experience during the past two years and its geographical location. Seeking to exploit these perceived strategic advantages, Pinnacle's business has grown each quarter since its inception. Because of a liquidity crunch, Pinnacle needed a significant amount of capital to finance the growth already experienced and to continue this growth. To meet this need, management considered the possibility of a strategic relationship with a large meat production company. After identifying Smithfield Foods, Inc. as the most appropriate equity partner and having Smithfield execute a Confidentiality Agreement, the Company began negotiating the outline, amount and nature of a potential equity investment by Smithfield in Pinnacle.

37.      On November 19, 2001, Pennexx filed with the SEC a Form 10QSB (hereinafter, "10-Q") quarterly report for the period ended September 30, 2001. The 10-Q acknowledged the Company's unprofitable history, but failed to fully disclose that the Company was still struggling to maintain liquidity, and blamed recent losses on "operational changes and processes which have now been overcome":

The Company has lost money continually since inception; however, the loss in September, 2001 was significantly lower than the losses in both July and August of 2001. The principal reason for the magnitude of the loss in July and August is

13

the Company's agreement to adopt a branded program for one of its major customers that resulted in significant operational changes and processes which have now been overcome.

***

**38.**       Also in the November 19, 2001, 10-Q, in a section titled "Liquidity and

Capital Resources," Pennexx represented the Smithfield Transactions as having solved, at least,

Pennexx's short-term liquidity problems, stating in pertinent part:

> Until the closing of the Smithfield transactions in June 2001, the Company had been chronically undercapitalized. ...
>
> By completing the Smithfield transactions, the Company addressed its liquidity problem in two ways. First, the Company's immediate need for capital was addressed by the $6 million purchase price paid by Smithfield for its equity stake in the Company. Second, the Company received a $30 million line of credit through Smithfield on terms that the Company had not been able to obtain before establishing the relationship with Smithfield. ... The Smithfield transactions should allow the Company to meet its capital needs for sufficient capital in the immediate future. Management is cautiously optimistic that operations will improve in the future; however, if they do not, there is no assurance that the Smithfield transactions will provide sufficient capital for the Company to operate successfully on a long-term basis.

## False and Misleading Statements During the Class Period

**39.**       The Class Period begins on February 8, 2002, when Pennexx issued a

press release announcing that the Company was changing its name from Pinnacle Foods, Inc. to

Pennexx Foods, Inc.  The press release quotes defendant Queen, who comments at length about

the Company's positive business prospects. Additionally, the press release credits the Smithfield

Transactions – and Smithfield Foods' "$36 million commitment" – as the catalyst for the

Company's move to the OTC Bulletin Board. The press release stated in part:

> Pennexx Foods, Inc. (OTC Bulletin Board: PFOD) today announced that its common stock is now listed for trading on the OTC Bulletin Board.

14

The company also announced that it has changed its name to Pennexx Foods, Inc. from Pinnacle Foods, Inc. and that its common stock will continue to trade under the stock symbol PFOD.

Michael Queen, president and CEO of Pennexx said, "Trading our common stock on the OTC Bulletin Board is a significant milestone for Pennexx and enables us to reach a broader investor audience. It was made possible by the registration of the common stock under the Securities Exchange Act of 1934. This registration resulted, in turn, from the $36 million commitment that Smithfield Foods, Inc., the leading processor and marketer of fresh pork and processed meats in the U.S., made to our company in June 2001."

Pennexx commenced operations in 1999, as the company recognized the opportunity to stake out a first-to-market position in the emerging market category for case-ready meat. Since then, the company has refined the operations, expanded its facilities, built a customer base and established a position as a leading provider of case-ready meat to retail supermarkets in the northeastern U.S.

"Case-ready" refers to meat products that can be taken out of a box and put directly into a retailer's meat case without any further processing or packaging. For the consumer, case-ready meat enhances food safety, provides leak-proof packaging and a greater variety of meat in stock because the packaging offers longer shelf life.

Pennexx Foods cuts, packages, processes and delivers case-ready beef, pork, lamb and veal and the business is largely regulated by the United States Department of Agriculture ("USDA"). At its facilities, Pennexx can achieve the trimming, cutting, wrapping, labeling, and pricing of a retail product with extended shelf life that cannot be achieved at the store level. The company uses modified atmosphere packaging ("MAP"), which refers to the use of deep barrier foam and plastic trays to house the meat, and the process of heat sealing the lid tightly, evacuating the atmosphere in the package, and replacing it with a non-chemical mixture that includes oxygen and carbon dioxide.

Mr. Queen continued, "Case-ready meat is rapidly becoming an attractive economic alternative to store processed meat for supermarket retailers as it enables stores to generate higher net profit. **This *growing demand* has fueled our company's growth**: for the full fiscal year 2001, we expect to report revenue in excess of $40 million, more than three times our revenue in 2000. We intend to aggressively expand the business by extending customer store penetration, acquiring new customers and introducing new products while maintaining our superior customer service. Having proven our business model and with the market for case-ready meat still in its infancy, we are confident that our prospects for

15

growth in 2002 are excellent," concluded Mr. Queen.  (Emphasis added.)

**40.**    Investors reacted highly favorably to the news stated in the February 8, 2002,

press release, including "growing demand" for case-ready meat, the Company's purportedly

"excellent" business prospects and Smithfield Foods' "$36 million commitment" – an amount

that should eliminate any liquidity issues for several years, based on the Company's historicals.

By the close of trading on that day, Pennexx stock had shot upward more than twenty-six percent

(26%) as a result of this news.

**41.**    On February 20, 2002, Pennexx issued a press release announcing that the

Company, then-operating in Pottstown, Pennsylvania, had agreed to purchase a new production

facility in Philadelphia.  In the press release, defendant Queen touted the Company's improved

prospects as a result of the move from its Pottstown plant, and stated that the new facility would

"optimiz[e] our growth and profit opportunities" with the potential for "exponential growth in

our business."  The press release, however, failed to disclose that the Company was experiencing

extreme business problems including insufficient demand, liquidity issues that threatened the

Company's ability to continue as a going concern, and that since November 2000 the Company

had been involved in litigation with the landlord of the Pottstown facility in which the landlord

was seeking damages and ejectment and alleged that Pennexx failed to make timely rent

payments. The press release stated as follows:

> Pennexx Foods, Inc. (OTC Bulletin Board: PFOD) today announced that it has
> entered into an agreement to purchase a 145,000 square foot facility on 10 acres of
> land in Philadelphia, Pennsylvania. The company anticipates that the transaction
> will close within the next 30 days.
>
> The facility was formerly used as a meat processing plant and was approved by
> the USDA. The company expects to make modest improvements in the facility to

16

satisfy its specifications and management plans to move into the space immediately.

**"We have been searching for a larger facility to accommodate the *escalating demand* of our case-ready business for some time now, having reached our anticipated capacity at our current facilities in the fourth quarter of 2001. The new facility will substantially increase Pennexx's case-ready production capabilities and begin to fulfill *existing business demand*," said Michael Queen, president and CEO of Pennexx. "It is perfectly suited to our needs, as it is strategically located in the central Northeast corridor and close to our customers. Since *the new facility requires minimal improvement, we will be able to renovate and automate quickly* and plan to be operational in this pristine facility by the second quarter of 2002.**

"We are on track with our growth plans. In fact, we are expecting to report revenue for fiscal 2001 of over $40 million, representing an increase in excess of 200% over the $13.5million in revenues we reported in 2000. We plan to announce fiscal 2001 financial results by the end of March."

**Mr. Queen continued, "This new facility gives us the means to ramp up production of higher margin, value-added product lines, optimizing our growth and profit opportunities.** With the automation processes we will have in place, we intend to become an industry leader in the emerging market category for case-ready meat in the northeast and realize exponential growth in our business." (Emphasis added.)

**42.**          In addition to misrepresenting the reason that Pennexx had to move to a new facility, defendants' description of the suitability of the new facility for the Company's operations was false and misleading. As defendants subsequently acknowledged, problems with starting operations in the new facility were a primary factor in the Company's default under the Credit Agreement with Smithfield Foods. Contrary to defendants' claims in the February 20, 2003, press release that the new processing plant was "perfectly suited" for its operations and would need only "minimal improvement" to meet escalating demand, Pennexx ultimately blamed the start-up problems associated with the new facility for significantly contributing to the Company's financial problems.

**43.**   Approximately six weeks later, on April 1, 2002, Pennexx issued a press release

announcing the Company's financial results for fourth-quarter and full-year 2001.  The press

release quotes defendant Queen, who commented positively about the Company's prospects and

"an escalating market demand for case-ready meat."  The press release stated in pertinent part:

> Pennexx Foods, Inc. (OTC Bulletin Board: PNNX), a leading provider of case-ready meat to retail supermarkets in the Northeast, today reported financial results for the fourth quarter and fiscal year ended December 31, 2001. Revenue for the fourth quarter reached $11.4 million, a 50% increase over the $7.6 million reported for the same quarter last year.

> Earnings (loss) before interest, taxes, depreciation and amortization (EBITDA) was $0.3 million for the fourth quarter of 2001 compared to ($2.5) million for the same period last year. Net income for the fourth quarter was $0.01 million compared to a net loss of $2.7 million for the same quarter last year.

> Revenue for the twelve months ended December 31, 2001 was $42.3 million compared to revenue of $13.6 million for the same period last year. Earnings (loss) before interest, taxes, depreciation and amortization (EBITDA) was ($1.9) million compared to ($4.3) million for the same period last year. Net loss in fiscal 2001 was $2.7 million, or $0.14 per share, compared with $5.0 million, or $0.52 per share, for fiscal 2000.

> **"Fourth quarter was the culmination of a transitional year for Pennexx during which we experienced tremendous growth *due to an escalating market demand* for case-ready meat," said Michael Queen, president and CEO of Pennexx.** "The primary success of the fourth quarter reflected an increase in volume of products handled as well as a favorable product mix of higher margin, whole muscle products such as lamb and veal. Along with a solid revenue increase, we realized improved yield and labor efficiency, which resulted in our profit in the fourth quarter." (Emphasis added.)

> Queen continued, "We are currently operating at full capacity at the Pottstown facility, which represents increased volume from the fourth quarter of 2001. To be able to accommodate future growth, we are acquiring a new plant in Philadelphia. When that new facility is operational, we expect that the company will be able to process significantly higher volumes of meat. From that time onward, as a result of the increased volumes, we expect that revenues and results from operations will compare favorably to the revenues and results of operations for the same periods in prior years."

**44.**    The April 1, 2002, press release repeated the financial results stated in the

Company's Form 10KSB (hereinafter, "10-K") Annual Report for 2001, filed March 29, 2002, with the SEC. The 10-K was signed by, among others, defendants Queen and McGreal.

45.     Two days later, on April 3, 2002, Pennexx issued a press release announcing that the Company had closed the acquisition of the new production facility in Pottstown. The press release quoted defendant Queen, who again touted the Company's prospects as a result of the move and "increasing demand for Pennexx's case-ready business," but failed to disclose the problems concerning the Company's Pottstown facility or that the landlord was seeking damages and ejectment. The press release stated in part:

> Pennexx Foods, Inc. (OTC Bulletin Board: PNNX), a leading provider of case-ready meat to retail supermarkets in the Northeast, announced that the company has closed on the acquisition of its new 145,000 square foot facility located on Tabor Avenue in Philadelphia.
>
> **Michael Queen, president and CEO of Pennexx said, "Our move to the new facility is a major milestone for the company. When operational, the new plant will substantially increase our production capabilities and accommodate *the increasing demand for Pennexx's case-ready business.*** Furthermore, we hope to use the new facility to ramp up our production of higher margin, value-added product lines, so that we can optimize our opportunities and achieve additional growth." (Emphasis added.)
>
> Mr. Queen added, "After having increased volume from the fourth quarter of 2001, when we achieved revenue of $11.4 million, we reached full capacity at our 40,000 square foot Pottstown facility in the first quarter of 2002. Although the new plant is nearly four times as large as our Pottstown facility, we expect to achieve higher revenues per square foot of production space in Philadelphia through improved automation and product mix. If we achieve these goals, we expect to end 2002 with a significantly increased annualized rate of revenue as we enter 2003."

46.     On May 15, 2002, Pennexx issued a press release announcing the Company's first-quarter 2002 financial results. The press release also included positive comments by defendant Queen about the Company's prospects as a result of the move to a new facility and

19

stated in pertinent part:

> Pennexx Foods, Inc. (OTC Bulletin Board: PNNX), a leading provider of case-ready meat to retail supermarkets in the Northeast, today reported financial results for the first quarter ended March 31, 2002.
>
> Revenue for the first quarter reached $10.9 million, a 36% increase over the $8.0 million reported for the same quarter last year. Earnings (loss) before interest, taxes, depreciation and amortization (EBITDA) was $0.2 million for the first quarter of 2002 compared to ($0.2) million for the same period last year. Net income for the first quarter was $7,450, or $0.00 per share, compared to a net loss of $404.8 thousand, or $0.03 per share for the same quarter last year.
>
> "During the first quarter of 2002, we operated at maximum capacity, posting solid year-over-year revenue growth. This was our second consecutive quarter of positive EBITDA and net income, demonstrating the viability of our business model," said Michael Queen, president and CEO of Pennexx. "In the first quarter, we also began renovation at our new Philadelphia facility and expect to begin installation of state-of-the-art automation equipment in the current quarter."
>
> Mr. Queen concluded, "We continue to expect that the new plant, which is nearly four times as large as our Pottstown facility, will substantially increase our present capacity, dramatically improve our operating efficiencies and service our growing customer base. In addition, the new facility will enable us to accommodate demand from these customers who are realizing the benefits of our full complement of case-ready meats. However, during the second and third quarters of 2002, we expect to incur some additional expenses resulting from the transition from the Pottstown plant to the Tabor Avenue plant. Once we complete the consolidation into the new facility, we expect to be in production by the end of third quarter 2002." (Emphasis added.)

\*\*\*

**47.**        Also on May 15, 2002, Pennexx filed with the SEC a 10-Q for first-quarter

2002. It was signed by defendant Queen and included the following statement.

> In the opinion of the Company, all adjustments, including normal recurring adjustments, necessary to present fairly the financial position of the Company as of March 31, 2002 and the results of its operations and cash flows for the three month period then ended have been included. The results of operations for the interim period are not necessarily indicative of the results for the year.