IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THE WINER FAMILY TRUST          :       CIVIL ACTION
                                :
                                :
          v.                    :
                                :
                                :
MICHAEL QUEEN, et al.           :       NO. 03-4318

**MEMORANDUM**

**Padova, J.**                                    **September 27, 2004**

Presently before the Court in this putative class action are two Motions to Dismiss the Amended Complaint, one filed by Smithfield Foods, Inc., Showcase Foods, Inc., Joseph W. Luter IV, and Michael H. Cole (the "Smithfield Defendants"), and the other filed by Pennexx Foods, Inc., Michael Queen, and Thomas McGreal (the "Pennexx Defendants"). For the reasons that follow, both Motions are granted in part and denied in part.

I.   BACKGROUND

This action is brought on behalf of two separate classes. On behalf of public investors who purchased the securities of Pennexx Foods, Inc.[1] ("Pennexx") during the period from February 8, 2002 until June 12, 2003 (hereinafter, the "Securities Class"), The Winer Family Trust (hereinafter, "Lead Plaintiff") alleges violations of Section 10(b) of the Securities Exchange Act of 1934

---

[1] Pennexx Foods, Inc. is a Pennsylvania corporation that provides case-ready meat to customers in the northeastern United States. Pennexx currently has no assets and is not operating as a business. (Am. Compl. ¶¶ 2, 13.)

("Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder, see 17 C.F.R. § 240.10b-5, against Pennexx; Joseph W. Luter IV, executive Vice President of Smithfield Foods, Inc.[2] ("Smithfield") and former Pennexx director; Michael H. Cole, associate general counsel of Smithfield and former Pennexx director; Michael Queen, Chief Executive Officer of Pennexx and Pennexx director; and Thomas McGreal, Vice President of Sales for Pennexx and Pennexx director (Count I).  On behalf of the Securities Class, Lead Plaintiff also alleges violations of Section 20(a) of the Exchange Act against Smithfield and the individual Defendants (Count II).  On behalf of public investors who currently own Pennexx securities (hereinafter, the "Fiduciary Class"), Lead Plaintiff asserts state law claims for breach of fiduciary duty against Queen (Count III); breach of fiduciary duty against Smithfield (Count IV); aiding and abetting Smithfield's breach of fiduciary duty against Luter and Cole (Count V); and successor liability against Smithfield and Showcase Foods, Inc. ("Showcase") (Count VI).

The essence of Lead Plaintiff's federal securities claims is that Defendants artificially inflated the price of Pennexx stock by

---

[2]  Smithfield Foods, Inc. is a Virginia corporation that produces, processes, and markets a variety of fresh pork and processed meat products, with operations in the United States and throughout the world.  (Am. Compl. ¶ 17.)

issuing public statements and filing earnings reports that omitted or misstated material facts concerning:

1. The denigration of the relationship between Pennexx and Smithfield, who owned 50% of Pennexx's stock, including the resultant conflicts;

2. Pennexx's acquisition of a new facility on Tabor Road in Philadelphia (the "Tabor Facility"), the adequacy of the Tabor Facility, and problems with the Tabor Facility's renovation and equipment;

3. Defendants' instructions to Pennexx's former Chief Financial Officer ("CFO"), George Pearcy, to materially understate Pennexx's second quarter 2002 financial losses, the subsequent termination of Pearcy for refusing to do so, and the material understatement of Pennexx's second quarter 2002 losses in the financial reports, despite Pearcy's protests;

4. Pennexx's severe liquidity problems;

5. Pennexx's increasing risk of default under its Credit Agreement with Smithfield; and

6. Pennexx's actual prospects for growth and increased market penetration.

(Am. Comp. ¶¶ 5-6.)

The essence of Lead Plaintiff's state law claim against Smithfield for breach of fiduciary duty is that Smithfield, having

been frustrated in its attempts to purchase Pennexx outright, implemented a willful and malicious scheme to undermine Pennexx's ability to operate as a going concern so that Smithfield could acquire Pennexx's assets and business opportunities on the cheap and without regard to shareholder rights.  Specifically, Lead Plaintiff asserts that Smithfield, aided and abetted by Luter and Cole, breached its fiduciary duties to the Fiduciary Class by:

1.    Coercively using its position as majority shareholder and primary lender and supplier of Pennexx to dominate and control Pennexx and its operations and drive up Pennexx's costs and interfere with its ability to run its business by deliberately delaying and misdesigning Pennexx's new Tabor Facility;

2.    Charging Pennexx excessive prices for supplies at prices even higher than those Smithfield charged to unaffiliated purchasers;

3.    Deliberately overstating the amounts of product purchased by Pennexx and willfully preventing Pennexx from timely ascertaining whether it was being shorted by installing non-functional equipment at the Tabor Facility;

4.    Using proprietary information from Pennexx to undermine and misappropriate Pennexx's contacts with its largest customer, Pathmark; and

5.    Willfully and maliciously undermining Pennexx's ability

4

to pay off its debt to Smithfield in order to prevent a competitor from acquiring Pennexx and so Smithfield could acquire all of Pennexx's assets and business opportunities for cheap, freezing out Pennexx's minority shareholders.

(Id. ¶¶ 8-9.)

Lead Plaintiff further alleges that Queen breached his duties to the Fiduciary Class, in his capacity as President of Pennexx, by entering into a forbearance agreement with Smithfield that provided for a broad and general release of Smithfield from liability for claims asserted by Pennexx and its stockholders.  (Id. ¶ 10.)

The Pennexx Defendants have moved to dismiss Count One against Pennexx, Queen, and McGreal; Count Two against Queen and McGreal; and Count Three in its entirety.  The Smithfield Defendants have moved to dismiss Count One against Luter and Cole; Count Two against Smithfield, Luter and Cole; and Counts Four, Five, and Six in their entirety.

II.  LEGAL STANDARD

When determining a Motion to Dismiss pursuant to Rule 12(b)(6), the court may look only to the facts alleged in the complaint and its attachments.  Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).  The court must accept as true all well pleaded allegations in the complaint and view them in the light most favorable to the Plaintiff.  Angelastro

v. Prudential-Bache Securities, Inc., 764 F.2d 939, 944 (3d Cir. 1985).  A Rule 12(b)(6) motion will be granted when a Plaintiff cannot prove any set of facts, consistent with the complaint, which would entitle him or her to relief.  Ransom v. Marrazzo, 848 F.2d 398, 401 (3d Cir. 1988).  Documents "integral to or explicitly relied upon in the complaint" and related matters of public record may be considered on a motion to dismiss.  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).

III. DISCUSSION

    A.   Rule 10b-5 Legal Standards

The Pennexx Defendants and the Smithfield Defendants move to dismiss Count I of the Amended Complaint, which asserts a securities fraud claim against Pennexx and the individual Defendants pursuant to Section 10(b) and Rule 10b-5.  Section 10(b) prohibits the "use or employ[ment], in connection with the purchase or sale of any security, . . . of any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C. § 78j(b).  Rule 10b-5 makes it illegal "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(b).

To state a Rule 10b-5 claim, a plaintiff must allege that the defendant (1) made a misstatement or an omission of a material fact; (2) with scienter; (3) in connection with the purchase or the sale of a security; (4) upon which the plaintiff reasonably relied; and (5) that plaintiff's reliance was the proximate cause of his or her injury. In re IKON Office Solutions, Inc., 277 F.3d 658, 666 (3d Cir. 2002). The Pennexx Defendants and the Smithfield Defendants both argue that the Amended Complaint does not adequately allege the material misstatement/omission and scienter elements of a Rule 10b-5 claim. The Pennexx Defendants also argue that Lead Plaintiff has failed to sufficiently plead the reliance element of a Rule 10b-5 claim.[3]

---

[3] The Pennexx Defendants argue that Lead Plaintiff improperly invokes the "fraud on the market" theory in alleging that the Securities Class reasonably relied on Defendants' misstatements and omissions of material fact. The "fraud on the market" theory provides for a rebuttable presumption of reliance if the plaintiff bought or sold securities in an "efficient" market. In re Burlington Coat Factory, 114 F.3d at 1419 n.8. Under the doctrine, the plaintiff need not show that he actually knew of the communication that contained the misrepresentation or omission. Id. Instead, the plaintiff's reliance is presumed based on the theory that in an efficient market the misinformation directly affects the stock prices at which the investor trades and, therefore, causes injury even in the absence of direct reliance. Id.

The Pennexx Defendants urge the Court to apply the five-factor test set forth in Cammer v. Bloom, 711 F. Supp. 1264 (D.N.J. 1989), in determining whether the Amended Complaint adequately alleges that Pennexx stock traded in an efficient market. The Cammer test instructs courts to inquire into (1) whether the stock traded at a high weekly volume; (2) whether a significant number of securities analysts followed and reported on the stock; (3) whether the stock has market makers and arbitrageurs; (4) whether the company is eligible to file Securities and Exchange Commission ("SEC")

1.    Misleading statements and omissions

Under the PSLRA, a Rule 10b-5 complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."   15 U.S.C. § 78u-4(b)(1).   A statement or omission is "material," for purposes of the securities laws, if there is a "substantial likelihood that, under all the circumstances, the [statement or omission] would have assumed

registration form S-3, as opposed to forms S-1 or S-2; and (5) whether facts show a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price. Id. at 1285-87. The Third Circuit has, however, made it clear that a complaint need not establish the Cammer factors to survive a motion to dismiss. See Hayes v. Gross, 982 F.2d 104, 107 n.1 (3d Cir. 1992)("We take note of the thorough analysis in [Cammer], where the district court, in ruling on a motion for summary judgment under Fed. R. Civ. P. 56, considered whether plaintiffs' affidavit showed 'specific facts' indicating an efficient market.  The court listed various factual allegations that could support an inference that the market for a security was efficient, including [the five factors].  At the time of a motion to dismiss under Rule 12(b)(6), however, a plaintiff need not show 'specific facts' as required under Rule 56(e).  As the court recognized in Cammer, on a motion to dismiss the question is whether plaintiff has alleged that the stock traded in an efficient market, or whether any of the facts alleged give rise to such an inference.").  The Court concludes that by alleging that, *inter alia*, Pennexx's stock price sharply rose or fell in response to unexpected disclosures by the company, Lead Plaintiff has adequately pled facts that give rise to an inference that Pennexx stock traded in an efficient market.  See Seidman v. American Mobile Sys., Inc., 813 F. Supp. 323, 325 & n.1 (E.D. Pa. 1993) (finding that complaint adequately pled existence of efficient market by alleging that stock price plunged following sudden disclosures by corporation).

actual significance in the deliberations of the reasonable shareholder." In re Aetna Inc. Sec. Litig., 34 F. Supp. 2d 935, 945 (E.D. Pa. 1999) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)). "[T]he issue is whether there is a substantial likelihood that the disclosure would have been viewed by the reasonable investor as having significantly altered the total mix of information available to that investor." Id. (quoting Shapiro v. UJB Financial Corp., 964 F.2d 272, 280 n.11 (3d Cir. 1992)). "Puffing" statements, i.e., vague expressions of corporate optimism and expectations about a company's prospects, are not actionable under the securities laws because reasonable investors do not rely on such statements in making investment decisions. Id.

         2.    Duty to disclose

The securities laws do not require a defendant "to disclose a fact merely because a reasonable investor would like to know that fact." In re Burlington Coat Factory, 114 F.3d at 1432 (quoting In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993)). "Even non-disclosure of material information will not give rise to liability under Rule 10b-5 unless the defendant had an affirmative duty to disclose that information." Oran v. Stafford, 226 F.3d 275, 285 (3d Cir. 2000); see also Basic, Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."). As a general matter, such an affirmative duty arises only when there is insider trading, a

statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure.  <u>Oran</u>, 226 F.3d at 285-86.

   3.   <u>Truth on the market defense</u>

As Lead Plaintiff relies on the fraud on the market theory in this action, Defendants may assert the "truth on the market" defense.  <u>In re Resource America Sec. Litig.</u>, Civ. A. No. 98-5446, 2000 WL 1053861, at *3 (E.D. Pa. July 26, 2000).  The "truth on the market" defense recognizes that a statement or omission is materially misleading only if the allegedly undisclosed facts have not already entered the market.  <u>Wallace v. Systems & Computer Tech. Corp.</u>, Civ. A. No. 95-6303, 1997 WL 602808, at *10 (E.D. Pa. Sept. 23, 1997) (citing <u>In re Convergent Tech. Sec. Litig.</u>, 948 F.2d 507, 513 (9th Cir. 1991)); <u>see also</u> <u>In re NAHC, Inc. Sec. Litig.</u>, Civ. A. No. 00-4020, 2001 WL 1241007, at *16 (E.D. Pa. Oct. 17, 2001) ("Where the information omitted from the allegedly misleading statements was previously or concurrently disclosed, even in another form, this may affect the materiality of the later omission.").  "Thus, a defendant can avoid liability for a false statement or one that reveals less than the truth of the matter by showing that the market was not affected by the representation because the truth of the matter was known already and had been factored into the market price."  <u>In re Bell Atlantic Corp. Sec. Litig.</u>, 1997 WL 205709, at *26 (E.D. Pa. Apr. 17, 1997).  To invoke the truth on the market defense, Defendants must prove that the

information at issue was "transmitted to the public with the degree of intensity and credibility sufficient to effectively counter-balance any misleading impression created by the insiders' one-sided representations."  In re Unisys Corp. Sec. Litig., Civ. A. No. 00-1849, 2000 WL 1367951, at *4 (E.D. Pa. Sept. 21, 2000) (quoting In re Apple Computer Sec. Litig., 886 F.2d 1109, 1116 (9th Cir. 1989)).  A motion to dismiss may be granted if "the company's SEC filings or other documents disclose the very information necessary to make their public statements not misleading." Wallace, 1997 WL 602808, at *10.

### 4.   Scienter

The Amended Complaint also must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  The United States Court of Appeals for the Third Circuit ("Third Circuit") has defined "scienter" as "a mental state embracing an intent to deceive, manipulate or defraud, or, at a minimum, highly unreasonable (conduct), involving not merely simple, or even excusable negligence, but an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  In re Alpharma Inc. Sec. Litig., 372 F.3d 137, 148 (3d Cir. 2004) (quoting In re IKON, 277 F.3d at 667).  "The requisite 'strong inference' of fraud

may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." In re Burlington Coat Factory, 114 F.3d at 1417. Failure to satisfy these pleading requirements results in dismissal. 15 U.S.C. § 78u-4(b)(3).

                    5.    Fed. R. Civ. P. 9(b)

     Because a claim under Section 10(b) and Rule 10b-5 is a claim for fraud, a plaintiff must also satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b). In re Advanta Corp. Sec. Litig., 180 F.3d 525, 531 (3d Cir. 1997). Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). "Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of securities fraud with all of the essential factual background that would accompany 'the first paragraph of any newspaper story' - that is, the 'who, what, when, where and how' of the events at issue." In re Rockefeller Center Properties, Inc. Sec. Litig., 311 F.3d 198, 217 (3d Cir. 2002) (quoting In re Burlington Coat Factory, 114 F.3d at 1422)). The court must analyze each statement at issue in order to assess whether each alleged misrepresentation is pleaded with the requisite specificity. In re Westinghouse Sec. Litig., 90 F.3d 696, 712 (3d Cir. 1996).

B.    <u>Rule 10b-5 Analysis</u>

The Court initially observes that, in attributing the allegedly misleading statements and omissions to the individual Defendants, Lead Plaintiff alleges as follows:

> Smithfield and the individual Defendants were provided with copies of Pennexx's management reports, press releases, and SEC filings. Armed with, and in control of such information, Smithfield and the individual Defendants granted interviews to newspaper reporters. The newspaper articles based on those interviews, as well as the Company's other publicly disseminated information are alleged herein to have been materially misleading to the investing public. Significantly, with respect to Pennexx press releases and SEC filings, Smithfield and the Individual Defendants had the ability and opportunity to write them, edit them, prevent their dissemination in the first place or to cause them to be corrected shortly after their dissemination. As a result, Smithfield and the individual Defendants were responsible for the accuracy of the public reports and releases detailed herein as "group published" information, and are therefore responsible and liable for the representations contained therein.

(Am. Compl. ¶ 26.)  By making these allegations, Lead Plaintiff seeks the benefit of the "group pleading" doctrine. Under this doctrine, the identification of the individual sources of statements is unnecessary when the fraud allegations arise from misstatements or omissions in group-published documents, such as annual reports, prospectuses, registration statements, press releases, or other "group published information" that presumably constitute the collective actions of those individuals involved in

the day-to-day affairs of the corporation.  Aetna, 34 F. Supp. 2d at 949 (citing Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1440 (9th Cir. 1987)).  The majority of district courts in this Circuit have held that the group pleading doctrine did not survive the enactment of the PSLRA.  See In re Digital Island Sec. Litig., 223 F. Supp. 2d 546, 553 (D. Del. 2002) (collecting cases), aff'd, 357 F.3d 322 (3d Cir. 2004).  Those courts have reasoned that "to permit a judicial presumption as to particularity simply cannot be reconciled with the statutory mandate that plaintiffs must plead specific facts as to each act or omission by the defendant."  Marra v. Tel-Save Holdings, Inc., Civ. A. No. 98-3145, 1999 WL 317103, at *5 (E.D. Pa. May 19, 1999) (quoting Allison v. Brooktree Corp., 999 F. Supp. 1342, 1350 (S.D. Cal. 1998)); see also P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp., 142 F. Supp. 2d 589, 619-20 (D.N.J. 2001) (noting that, if group pleading doctrine is still viable, "the requirement to plead scienter with particularity as to each defendant is meaningless").

In view of the prevailing case law in this Circuit, the Court concludes that Lead Plaintiff cannot rely on the group pleading doctrine to plead a Rule 10b-5 claim.  The PSLRA does allow plaintiffs to assert upon information and belief that a statement or omission is misleading, provided that the complaint states with particularity all facts on which this belief is formed.  15 U.S.C. § 78u-4(b)(1).  "For instance, if the alleged misleading statement

14

appears in a press release issued by a company discussing financial performance, a plaintiff could plead on information and belief that the chief financial officer is responsible for making the statement if the plaintiff can plead with specificity why the officer's position directly involves such duties or why a specific corporate policy requires that the chief financial officer make such releases." Coates v. Heartland Wireless Communications, Inc., 26 F. Supp. 2d 910, 916 n.2 (N.D. Tex. 1998). However, the conclusory allegations set forth in paragraph 26 of the Amended Complaint are insufficient under the PSLRA's information and belief pleading standard. See Marra, 1999 WL 317103, at *6 (allegations that individual defendants "had access to the adverse undisclosed information . . . from internal corporate documents" and were "involved in the drafting, producing, reviewing, and/or disseminating" the misstatements, coupled with allegation that defendants signed various annual reports, were insufficient). As the only allegation connecting Luter, Cole[4] and McGreal to the alleged misstatements is the group pleading allegation in paragraph 26 of the Amended Complaint, the Motions to Dismiss are granted

---

[4]    The Amended Complaint does allege that Cole dictated the contents of Pennexx's September 25, 2002 press release. (Am. Compl. ¶ 105.)  As discussed below, however, the Court concludes that none of the alleged misstatements from Pennexx's September 25, 2002 press release are actionable under the securities laws.

with respect to the claims against those Defendants in Count One.[5]
The Amended Complaint does, however, contain numerous allegations
that directly attribute the misstatements and omissions of material
fact to Queen, who is regularly quoted in Pennexx's press releases.
The Court will, therefore, analyze each alleged misstatement and
omission to determine whether Lead Plaintiff has stated a claim
against Queen and/or Pennexx[6] for securities fraud under Rule 10b-
5.

Plaintiffs' 10b-5 claims are based on allegedly false or
misleading statements contained in several different press releases
issued by Pennexx and in Pennexx's quarterly and annual earnings
reports that were filed with the SEC.  The subject matter of the
alleged misstatements falls into six general categories: (1) the
antagonistic relationship between Pennexx and Smithfield; (2)
problems related to the renovations of Pennexx's Tabor Facility;
(3) Pennexx's material understatement of its second quarter 2002

---

[5] Assuming, *arguendo*, that the group pleading doctrine were
viable under the PSLRA, the majority of the alleged misstatements
would still not be attributable to Luter, Cole, and McGreal.  As
set forth below, the majority of the alleged misstatements consist
of quotes from Queen contained in various Pennexx press releases.
Courts have found that such statements cannot be imputed to non-
speaking defendants under the group pleading doctrine.  See D.E. &
J Ltd. Partnership v. Conaway, 284 F. Supp. 2d 719, 732-33 (E.D.
Mich. 2003) (collecting cases).

[6] It is well-settled that the knowledge of officers and
directors of a corporation is imputed to the corporation for
purposes of Rule 10b-5 liability.  SEC v. Ballesteros Franco, 253
F. Supp. 2d 720, 728-29 (S.D.N.Y. 2003).

16

financial losses and termination of its CFO for refusing to understate the losses; (4) Pennexx's severe liquidity problems; (5) Pennexx's risk of default under its Credit Agreement with Smithfield; and (6) the "growing demand" for Pennexx's products.[7]

### 1.   Pennexx-Smithfield relationship

Lead Plaintiff argues that Pennexx issued several press releases that misstated or omitted material facts concerning the company's relationship with Smithfield.   Lead Plaintiff first challenges statements made in Pennexx's February 8, 2002 press release, in which the company announced that it was changing its name from Pinnacle Foods, Inc. to Pennexx Foods, Inc., and that its common stock had been listed for trading on the OTC Bulletin Board. (Am. Compl. ¶ 65.)  The press release quoted Queen as stating that the registration of Pennexx's common stock under the  Exchange Act was made possible by "the *$36 million commitment* that Smithfield Foods, Inc., the leading processor and marketer of fresh pork and processed meats in the U.S., made to our company in June 2001."

---

[7] At the conclusion of a hearing on the instant Motions held on April 7, 2004, the Court requested that Lead Plaintiff file a supplemental submission distilling the 97-page Amended Complaint into a comprehensive chart which outlines the specific statements and omissions that Lead Plaintiff asserts state a Rule 10b-5 claim. (4/7/04 N.T. at 79-81); see In re Boston Technology, Inc. Sec. Litig., 8 F. Supp. 2d 43, 56 n.13 (D. Mass 1998) (noting that "the burden of matching statement with omission should not be the Court's") (brackets and citation omitted).   Lead Plaintiff submitted the requested chart, which organizes the alleged misstatements into the six categories set forth above. The Pennexx Defendants and the Smithfield Defendants thereafter filed a joint response to Lead Plaintiff's supplemental submission.

(Id.)(emphasis added).  Lead Plaintiff contends that the portrayal of Smithfield as a catalyst for Pennexx in the February 8, 2002 press release is misleading, as the parties' previous partnership had been an unprofitable disaster for Pennexx.  The Amended Complaint alleges that, in August 2000, Smithfield contracted with Pennexx to help Smithfield supply Wal-Mart with case-ready pork. (Id. ¶ 39.)  Under the agreement with Smithfield, Pennexx prepared and delivered Smithfield's branded case-ready pork to a Wal-Mart distribution facility located in New York.  (Id.)  The Smithfield pork product had been injected with water, which was lost during processing, resulting in low production yields.  (Id. ¶ 40.)  For this reason, the Wal-Mart arrangement with Smithfield was unprofitable for Pennexx.  (Id.)

Even assuming that the undisclosed information was material, Pennexx had no duty to disclose such information because the challenged statement by Queen, which only concerned the undisputed fact that the equity investment made by Smithfield helped facilitate Pennexx's registration of its common stock under the Exchange Act, was not so incomplete as to mislead investors.  See Brody v. Transitional Hopsitals Corp., 280 F.3d 997, 1006 (9th Cir. 2002) ("Rule 10b-5 . . . prohibit[s] *only* misleading and untrue statements, not statements that are incomplete. Often, a statement will not mislead even if it is incomplete or does not include all relevant facts.") (internal citation omitted) (emphasis in

original); <u>Blackman v. Polaroid Corp.</u>, 910 F.2d 10, 16 (1st Cir. 1990) (en banc) ("[The duty to disclose rule] does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise, but means only such others, if any, that are needed so that what was revealed would not be so incomplete as to mislead."). Moreover, the Amended Complaint does not sufficiently allege facts giving rise to a strong inference that Queen acted with scienter in making the challenged statements. As the challenged statements and omissions from the February 8, 2002 press release are not actionable under the securities laws, the Pennexx Defendants' Motion to Dismiss is granted in this respect.

Lead Plaintiff also argues that several of Pennexx's press releases omitted material facts concerning the increasingly adversarial relationship between Pennexx and Smithfield and misled the market by creating the facade of a harmonious and mutually beneficial relationship between the parties. Lead Plaintiff cites Pennexx's August 20, 2002 press release, which included the following quote from Queen:

> We expedited the move to our new 145,000-square foot facility even as demand exceeded our capacity at the Pottstown facility. To the entire organization's credit, the transfer of existing processing machinery and employees was seamless. In addition, we were fortunate to have access to the production capabilities of our partners at Smithfield Foods to satisfy some of the demand for pork products while we fulfilled orders for red-meat products from

19

our customers.  *We are deeply appreciative of their support and dedication to our vision this quarter.*

(Am. Compl. ¶ 97)(emphasis added).

Lead Plaintiff maintains that the challenged statements from the August 20, 2002 press release were misleading because Moyer Packing Company, a Smithfield subsidiary, had been overcharging and shorting Pennexx for supplies and because Smithfield refused Pennexx's repeated requests for installation of adequate scales to monitor the Moyer's supply shipments.  However, the Amended Complaint does not sufficiently allege facts giving rise to a strong inference that Queen acted with scienter in making the challenged statements.  Indeed, the Amended Complaint does not allege that, as of August 20, 2002, Queen was even aware of the omitted information.  As the challenged statements and omissions from the August 20, 2002 press release are not actionable under the securities laws, the Pennexx Defendants' Motion to Dismiss is granted in this respect.[8]

---

[8] Lead Plaintiff also challenges Pennexx's September 25, 2002 press release, in which the company disclosed that the costs of vacating its former plant and of opening its new plant would contribute to a loss for the third quarter of 2002. (Am. Compl. ¶ 104.)  Lead Plaintiff does not specify, however, which statements from the September 25, 2002 press release are alleged to have been misleading, as required under the PSLRA.  See 15 U.S.C. § 78u-4(b)(1).  In any event, the Court concludes that none of the statements contained in the September 25, 2002 press release, which related only to the costs incurred by Pennexx in vacating the Pottstown plant and moving into the Tabor Facility, were misleading because Pennexx had no duty to disclose any information regarding the company's relationship with Smithfield.  See Brody, 280 F.3d at

Lead Plaintiff also challenges Pennexx's October 4, 2002 press release, in which the company announced that it had "reached an agreement with Smithfield Foods, Inc. for an unconditional waiver through October 30, 2002 related to a net-worth covenant under the company's credit agreement signed in May 2001 between Smithfield Foods, Inc. and Pennexx Foods." (Am. Compl. ¶ 110.) Queen was quoted in the press release as stating that Pennexx "continue[s] to work closely with our *strategic partner*, Smithfield Foods, to solve our short-term financial issues and *they are cooperating fully with us in this endeavor*." (Id.) (emphasis added). Lead Plaintiff contends that the cooperative relationship between Pennexx and Smithfield portrayed in the October 4, 2002 press release was misleading because, as set forth in Pennexx's Cross-Claim against Smithfield, Luter and Cole had instructed Smithfield's lawyers to delete references to the antagonistic relationship between the parties from the minutes of a September 2002 Pennexx board meeting. (Id. ¶ 103.) Pennexx agreed to the materially inaccurate minutes after Smithfield threatened to refuse to sign an amendment to the parties' Credit Agreement. (Id.) Lead Plaintiff also notes that, according to Queen's Declaration, Smithfield refused to waive a looming covenant default under the parties' Credit Agreement and insisted on "strict compliance" with all terms. (Id. ¶ 101(b).)

---

1006; Blackman, 910 F.2d at 16. Accordingly, none of the statements from the September 25, 2002 press release are actionable under the securities laws.

At a board meeting of the Company in September 2002, Luter and Cole voted against a motion allowing the Company to raise equity capital to avoid the looming default. (Id. ¶ 101(c)). Furthermore, Smithfield's engineer, Robert McClain, who had no prior experience in the construction or design of a beef facility, made it clear to Queen that Smithfield would totally control the construction of the Tabor Facility, including the specifications for the plant, engineering issues, and communications with subcontractors. (Id. ¶ 101(d)).

The only alleged omission that has any direct bearing on the accuracy of Queen's statement that Smithfield was cooperating with Pennexx in resolving the company's "short-term financial issues" is the decision of Luter and Cole to vote against a motion to allow Pennexx to raise additional equity capital. However, "general positive statements do not give rise to a duty to disclose the details of internal corporate disputes." Kane v. Madge Networks N.V., Civ. A. No. 96-20652, 2000 WL 33208116, at *9 (N.D. Cal. May 26, 2000). Moreover, Queen's characterization of Smithfield as Pennexx's "strategic partner" is immaterial puffery that is inactionable under the securities laws.[9] Furthermore, even

---

[9] The Court notes that Pennexx had, in any event, previously disclosed to the market that, despite the companies' joint venture, Smithfield was a major competitor in the case-ready meat industry. See (Pennexx Form 10-KSB (filed March 29, 2002); Smithfield Ex. 25, at 4-5) ("If the trend to case-ready distribution continues, Pennexx believes it is highly likely that more [competitors] will enter the Northeastern United States before long. Moreover,

assuming that Queen's statements from the October 4, 2002 press release were materially misleading with respect the nature of the Pennexx-Smithfield relationship, the Court concludes that Lead Plaintiff has failed to sufficiently allege facts giving rise to a strong inference that Queen acted with scienter in making the challenged statements. Queen's statements were made in the context of announcing that Smithfield had waived Pennexx's default under the parties' Credit Agreement. If Smithfield had not elected to waive the default, it would have been immediately entitled to foreclose on all of Pennexx's assets, effectively eliminating the company's ability to continue as a going concern. Thus, although Pennexx's relationship with Smithfield may have been growing increasingly tense, the waiver agreement was of such benefit to Pennexx that Queen's positive statements in the October 4, 2002 press release cannot be considered "an extreme departure" from the standards of ordinary care. As the challenged statements and omissions from the October 4, 2002 press release are not actionable under ths securities laws, the Pennexx Defendants' Motion to Dismiss is granted in this respect.

Lead Plaintiff also challenges statements made in Pennexx's Form 10-QSB for the third quarter of 2002, which was filed with the SEC on November 14, 2002. The SEC filing reported as follows:

---

Smithfield itself operates a case-ready pork plant located in Virginia.").

23

The Credit Agreement between the Company and Smithfield Foods, Inc. requires, among other things, that the Company maintain positive shareholders' equity . . . At September 30, 2002, the Company's shareholders' equity was not positive; however, Smithfield waived any defaults relating to compliance with the Net Worth Covenant to and including November 5, 2002, although Smithfield advised the Company that, in the future, it would insist on strict compliance with the terms of the Credit Agreement. In effect, the Company was given thirty-six days in which to cure what would otherwise have been a default.

*To avoid such a default, the Company raised $2.0 million by the sale of shares of common stock in a private placement of securities.*

(Am. Compl. ¶ 113)(emphasis added). Lead Plaintiff asserts that the Form 10-QSB failed to disclose that Pennexx had raised the additional $2 million in a private placement of securities over Smithfield's objections. Specifically, the Amended Complaint alleges that, on November 6, 2002, Cole wrote a letter to Queen in which he advised that "in light of such waivers, Joe Luter, IV and I believe it would highly inappropriate for Pennexx to go forward with any sale of common stock." (Id. at ¶ 112.) The Court notes, however, that "[d]isclosure of the business strategy supported by a majority of the directors d[oes] not obligate defendants also to disclose information about the extent to which each individual Board member support[s] that [strategy]." Cooperman v. Individual Inc., 171 F.3d 43, 51 (1st Cir. 1999). As the challenged statements and omissions from Pennexx's November 14, 2002 SEC

24

filing are not actionable under the securities laws, the Pennexx Defendants' Motion to Dismiss is granted in this respect.

Lead Plaintiff also argues that Pennexx concealed the company's antagonistic relationship with Smithfield by omitting from its January 30, 2003 press release that Luter and Cole, both of whom were Smithfield employees, had resigned from the Pennexx Board of Directors on January 24, 2003.  (Am. Compl. ¶ 121.)  When Pennexx finally disclosed the resignations of Luter and Cole in its February 12, 2003 press release, Queen misleadingly thanked them for "helping guide Pennexx through its start-up phase of business." (Id. ¶ 122.)

The Court concludes that Pennexx had no duty to disclose the resignations of Luter and Cole in the January 30, 2003 press release, which dealt only with the company's raising of $3.5 million of a board-approved $5 million private placement of securities. See Brody, 280 F.3d at 1006; Blackman, 910 F.2d at 16. Moreover, it is well-settled that "[m]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud."  Acito v. IMCERA Group, Inc., 47 F.3d 47, 53 (2d Cir. 1995).   The Court further concludes that the challenged statement from the February 12, 2003 press release constitutes immaterial "puffery" and would be understood by reasonable investors as such, regardless of any disputes that arose between Luter and Cole and Pennexx's inside

25

directors during the securities class period.  As the challenged statements and omissions from the January 30, 2003 and February 12, 2003 press releases are not actionable under the securities laws, the Pennexx Defendants' Motion to Dismiss is granted in this respect.[10]

### 2.   <u>Tabor Facility</u>

Lead Plaintiff argues that Pennexx issued several press releases that misstated or omitted material facts concerning the renovation and operation of the Tabor Facility.  Lead Plaintiff first challenges Pennexx's February 20, 2002 press release, in which the company announced that it had agreed to purchase the Tabor Facility.  In the press release, Queen was quoted as stating:

> [The Tabor Facility] is perfectly suited to our needs, as it is strategically located in the central Northeast corridor and close to our customers.  Since the new facility requires minimal improvement, we will be able to renovate and automate quickly and plan to be operational in this pristine facility by the second quarter of 2002.

(Am. Compl. ¶ 70).  Lead Plaintiff contends that Queen failed to disclose that Smithfield exclusively controlled the purchase of,

---

[10] Lead Plaintiff also argues that Pennexx's February 18, 2003 press release, which discussed a February 15, 2003 article in the <u>New York Times</u> concerning the case-ready meat industry, concealed the antagonistic relationship between Pennexx and Smithfield.  The Court concludes that Queen and Pennexx had no duty to disclose any information regarding the Pennexx-Smithfield relationship in a press release that discussed the case-ready meat industry in general terms.  <u>See</u> <u>Brody</u>, 280 F.3d at 1006; <u>Blackman</u>, 910 F.2d at 16.

and renovations to, the Tabor Facility and that, as a result, the Tabor Facility was not going to be designed to meet *Pennexx's* needs. However, there are no allegations in the Amended Complaint which establish that, as of February 20, 2002, Queen knew that Smithfield would, to the detriment of Pennexx, exclusively control the Tabor Facility project. Indeed, Pennexx's acquisition of the Tabor Facility was not even finalized until April 2, 2002. (Queen Dec. ¶ 9.) Lead Plaintiff has, therefore, failed to sufficiently allege facts giving rise to a strong inference that Queen acted scienter. As the challenged statements and omissions from the February 20, 2002 press release are not actionable under the securities laws, the Pennexx Defendants' Motion to Dismiss is granted in this respect.

Lead Plaintiff also argues that Pennexx's press releases and SEC filings during the period of March 29, 2002 through May 22, 2002 were misleading because they failed to disclose that, during a walking tour of the Tabor Facility on or about March 28, 2002, Joseph Luter III, president of Smithfield, had advised the individual Defendants that Pennexx should spend whatever was necessary to make the Tabor Facility a high-quality operation. Lead Plaintiff maintains that this disclosure was necessary to correct Queen's statement in the February 20, 2002 press release that the Tabor Facility would only require "minimal improvement." Lead Plaintiff further contends that the challenged statements

failed to disclose that, as set forth in Queen's Declaration, Smithfield was controlling the renovations of the Tabor Facility by employing its own staff, including a project manager with no prior experience in the design or construction of a meat construction plant, to perform the engineering, design, and supervision of the project, and that Smithfield instructed its staff not to take any directions from Pennexx employees.  (Am. Compl. ¶ 81.)

As the Smithfield Defendants correctly note, however, Mr. Luter III's statement to the individual Defendants that Pennexx should spend whatever was necessary to make the Tabor Facility a high-quality operation does not necessarily imply that the plant needed anything more than minimal improvements.  In any event, on April 2, 2004, merely five days after Mr. Luter III made the comments at issue, Pennexx disclosed in its Form 8-K that renovating and equipping the Tabor Facility would cost an estimated $8.5 million to $16.0 million.  Thus, the most plausible inference from these events is that Pennexx realized during the March 28, 2002 tour that the cost of renovating and equipping the Tabor Facility would be more extensive than previously thought, which the company promptly disclosed to investors.  See In re Digital Island Sec. Litig., 357 F.3d 322, 330 (3d Cir. 2004) (noting that, in contrast to the ordinary Rule 12(b)(6) standard, "the PSLRA requires a strong - as opposed to merely reasonable - inference to survive a motion to dismiss").  The Court concludes, therefore,

28

that Lead Plaintiff has failed to sufficiently allege facts giving rise to a strong inference that Queen and Pennexx acted with scienter in disclosing that the Tabor Facility would require only "minimal improvement," and that, in any event, the challenged statements were not misleading because the allegedly undisclosed facts were otherwise transmitted to the market in a timely manner. The Court further concludes that Pennexx did not have a duty to disclose that Smithfield's staff was performing the renovations of the Tabor Facility, as the challenged statements merely provided a general outline of Pennexx's plans and objectives with respect to the renovation and future operation of the Tabor Facility. See Brody, 280 F.3d at 1006; Blackman, 910 F.2d at 16. Moreover, the Amended Complaint does not sufficiently allege facts giving rise to a strong inference that Queen or Pennexx acted with scienter in failing to specifically disclose Smithfield's role in the Tabor Facility renovations. As the challenged statements and omissions from the press releases and filings at issue are not actionable under the securities laws, the Pennexx Defendants' Motion to Dismiss is granted in this respect.

Lead Plaintiff also challenges statements made in Pennexx's July 11, 2002 press release, which announced that the company had completed the move from its Pottstown, Pennsylvania plant to the Tabor Facility. The press release quoted Queen as stating, in part:

> With demand for our case-ready products
> expanding, we anticipated the need to expedite
> access to the new facility. Before reaching a
> point where our commitments to our customers
> suffered, we decided to accelerate our
> relocation timetable from August to early
> July. At this point, having transferred and
> installed existing processing machinery and
> relocated nearly all of our employees, we will
> initially be occupying 75,000 square feet of
> the new facility. We are on schedule to
> install our new customized automation
> equipment and to complete renovations of the
> unoccupied part of the facility by the end of
> October. Once the consolidation into our new
> facility is complete, we anticipate the
> combination of the larger space and new state-
> of-the-art equipment will improve production
> flow, reduce our labor costs and improve
> overall yields.

(Id. ¶ 90)(emphasis added). Lead Plaintiff contends that the July 11, 2002 press release failed to disclose that the premature move was prompted by a June 21, 2002 court order evicting Pennexx from its Pottstown facility. Lead Plaintiff further asserts that the July 11, 2002 press release was misleading because it misstated the adverse impact of Pennexx's premature move on both the company's financial performance and the renovations of the Tabor Facility.

The Court notes, however, that Pennexx had previously advised the market in its SEC filing of April 12, 2002 as follows:

> The current lease at the Pottstown plant
> terminates in accordance with its terms on
> April 30, 2002. However, the Company
> nonetheless expects to continue to use the
> plant for production after that date because
> the Tabor Avenue Facility will not yet be
> operational. Quite aside from the merits of
> the litigation [with the Pottstown landlord],
> the Company will become a holdover tenant and

30

> might not be able to remain in possession of the Pottstown plant if challenged by the landlord.  Because management does not believe the Tabor Avenue Facility will be operational until the end of the third quarter of 2002, the Company's inability to continue use of the Pottstown facility until then would have a material, adverse effect on the Company's operations.

(Pennexx Form 8-K (April 12, 2002), at 3); (see also Pennexx Form 10-QSB (May 15, 2002) (disclosing that Pottstown lease had expired and reiterating statements from April 12, 2002 filing).)  Thus, while the July 11, 2002 press release did not expressly acknowledge the operational and financial consequences of a premature move to the Tabor Facility, this information had already been transmitted to the public "with the degree of intensity and credibility sufficient to effectively counter-balance any misleading impression created by the insiders' one-sided representations."  In re Unisys Corp., 2000 WL 1367951, at *4 (quoting In re Apple Computer Sec. Litig., 886 F.2d 1109, 1116 (9th Cir. 1989)).  Furthermore, it is immaterial as a matter of law that the July 11, 2002 press release failed to specifically attribute the early move to an adverse ruling in Pennexx's litigation with its Pottstown landlord, as the company's previous SEC filings made clear that a premature move to the Tabor Facility would be problematic no matter what the cause. As the  challenged statements and omissions from the July 11, 2002 press release are not actionable under the securities laws, the Pennexx Defendants' Motion to Dismiss is granted in this respect.

Lead Plaintiff also challenges the disclosures made by Pennexx in its August 20, 2002 press release, which quoted Queen as stating, in part:

> We expedited the move to our new 145,000-square foot facility even as demand exceeded our capacity at the Pottstown facility.  To the entire organization's credit, *the transfer of existing processing machinery and employees was seamless* . . .  Since moving into the new facility, we have made *excellent progress toward completing renovations* and *have begun installing the customized automation equipment required for Pennexx to solidify its leadership position* in the case-ready meat revolution.  We *remain on schedule* to complete the consolidation of the new facility by the end of October.

(Am. Compl. ¶ 97) (emphasis added).  Lead Plaintiff argues that the August 20, 2002 press release omits any mention of the operational problems at the Tabor Facility, which were identified the following day in a confidential letter from Queen to Luter.  (Id. ¶ 96.)  In the confidential letter, Queen stated that "You asked me to identify operational opportunities at Pennexx so that you could work on helping solve these issues and I have spent the last 24 hours on identifying what I believe our issues to be.  I will outline these issues and also update you on my current plans in correcting these problems."  (8/21/02 Letter, Smithfield Ex. 56.) In a section of the letter entitled "Operational Opportunities," Queen noted that Pennexx's "greatest need is for a fully functional MIS (Management Information System)."  (Id.)  To address this need, Queen advised that he had "worked with Marel USA, the company

32

developing our production systems, in both cutting and software, to give us the best yield and labor tracking tools available in the world." (Id.)  Queen also expressed confidence that Pennexx's "new equipment will be the first of its kind in the U.S. and will set us way ahead of our competitors," and, "[m]ore importantly, it will give management the information it needs to address poor performance in yields, labor and productivity on a minute-by-minute basis."  (Id.)

The Court finds that Queen's statement in the August 20, 2002 press release that Pennexx "ha[s] begun installing the customized automation equipment *required* for Pennexx to solidify its leadership position in the case-ready meat revolution" adequately reflects the sentiments he expressed in his confidential letter to Luter.  Investors could readily infer from this excerpt of the press release that Pennexx was experiencing operational difficulties inasmuch as the customized automation equipment - which was essential to the company's success - had not yet been fully installed.  Moreover, in its Form 10-QSB filed with the SEC on August 19, 2002, Pennexx had disclosed to the market as follows:

> The acceleration of the timing of the move from Pottstown to Tabor Avenue means that new equipment intended to automate the new plant will have to be installed around the work schedule of the new plant after such new equipment arrives. Moreover, the Company will be required to subcontract a portion of its work for a time through a transition period until the new plant is completely configured and the new equipment is completely installed

> . . . . These events will have an adverse financial effect on the Company.

(Smithfield Ex. 6, at 13.)  Furthermore, even if Queen had a duty to more specifically disclose the operational problems of the Tabor Facility that were known to him as of August 20, 2002, Lead Plaintiff has failed to sufficiently allege facts giving rise to a strong inference that Queen acted with scienter in omitting such details.  Indeed, the August 21, 2002 letter reveals that Queen was very optimistic that the plant's operational problems would be overcome in the near future, as the new automation equipment, which was in the process of being installed in plant, "would set [Pennexx] way ahead of our competitors" and vastly improve the Company's performance efficiencies.  (8/21/02 Letter, Smithfield Ex. 56.)  There is no indication that Queen had any reason to believe, as of August 20, 2002, that the automation equipment would be improperly installed by Smithfield's staff.  As the challenged statements and omissions from the August 20, 2002 press release are not actionable under the securities laws, the Pennexx Defendants' Motion to Dismiss is granted in this respect.

Lead Plaintiff further contends that the August 20, 2002 press release was misleading because the move to the Tabor Facility was not "seamless" and "excellent progress" had not been made on the renovations as of that date.  However, the press release neither stated nor implied that the move to the Tabor Facility was "seamless" in all material respects.  Rather, the press release

stated only that the "the transfer of existing processing machinery and employees was seamless." Indeed, Pennexx's prior disclosures made clear that the premature move to the Tabor Facility would be significantly disruptive to the company's operations. (See, e.g., Pennexx Form 10-QSB (August 19, 2002), at 13.) Furthermore, Queen's vague assertion in the press release that Pennexx had made "excellent progress" toward completing the renovations is immaterial puffery. Queen's optimism was, in any event, tempered by the company's disclosure, just one day earlier in its Form 10-QSB, that full operations would not be established at the Tabor Facility "until at least September, 2002 and perhaps until October, 2002." (Id. at 12.) As the challenged statements and omissions from the August 20, 2002 press release are not actionable under the securities laws, the Pennexx Defendants' Motion to Dismiss is granted in this respect.

Lead Plaintiff also argues that Pennexx's September 25, 2002 and October 4, 2002 press releases, along with the company's November 14, 2002 Form 10-QSB for the quarterly period ending September 30, 2002, omitted material facts concerning the failure of necessary equipment to be installed at the Tabor Facility and the serious design flaws in the Tabor Facility. Lead Plaintiff relies on Queen's deposition testimony from Pennexx's litigation with its Pottstown landlord, in which he advised that, as of November 2002, the Tabor Facility was "still running without

35

equipment and very inefficient.  We didn't get the equipment in till December or, I'm sorry, the latter part of November that would have helped us get to where we needed to get.  And that's when all the money - money need came, because we didn't get it done in time."  (Am. Compl. ¶ 118.)  Furthermore, according to Queen's Declaration, Robert McClain "had no prior experience in the design or construction of a facility that processed beef" and  "ultimately overran the Smithfield budget by more than $2 million and in an attempt to save face with his employer, began to cut corners on the implementation of the final portions of the work," which "resulted in significant flaws in the design and construction of the beef grinding process."  (Id. ¶ 101.)  Furthermore, McClain "made the unilateral decision to deviate from the original plans for beef grinding operation," forcing Pennexx to use "a smaller and productively inefficient operation that was substandard for any ground meat production."  (Id. ¶ 116.)

Contrary to Lead Plaintiff's assertions, Pennexx made clear to the market that, as of November 14, 2002, the installation of necessary equipment at the Tabor Facility was still incomplete, and that the company would continue to operate inefficiently until such installation was complete.  As discussed above, Pennexx disclosed in its Form 10-QSB for the second quarter of 2002, which was filed on August 19, 2002, that the acceleration of the timing of the move from the Pottstown facility to the Tabor Facility would have an

adverse financial impact on the company.  (Smithfield Ex. 6, at 13).  Pennexx's September 25, 2002 Press Release noted that "[a]dditional expenses related to the relocation, including installation and training costs, will also weigh on the results of operation for September and October, and possibly, later into the fall" and advised investors that the Tabor Facility's renovations would not be complete for another ninety days.  (Smithfield Ex. 22.)  Pennexx further disclosed in its Form 10-QSB for the third quarter of 2002, which was filed on November 14, 2002, that "[b]ecause the equipment installation will not be complete until approximately December 15, 2002, Management expects continuing losses into the fourth quarter of 2002."  (Smithfield Ex. 7, at 16.)  There are no allegations in the Amended Complaint that, as of November 14, 2002, Queen, or anyone else employed by Pennexx, was even aware that McClain would not install of all the necessary equipment.

Furthermore, the Amended Complaint does not allege that Queen, or anyone else employed by Pennexx, was even aware of the undisclosed design flaws of the Tabor Facility as of November 14, 2002.  Indeed, given that McClain's misconduct allegedly occurred on the "final portions of the work," the most plausible inference is that the undisclosed design defects and equipment problems first surfaced during the last few weeks leading up to completion of the Tabor Facility renovations in January 2003.  See In re Digital

Island Sec. Litig., 357 F.3d 322, 330 (3d Cir. 2004)(noting that, in contrast to the ordinary Rule 12(b)(6) standard, "the PSLRA requires a strong - as opposed to merely reasonable - inference to survive a motion to dismiss").  Lead Plaintiff has, therefore, failed to sufficiently allege facts giving rise to a strong inference that Queen and Pennexx acted with scienter in omitting the undisclosed information.  Furthermore, Queen and Pennexx were not obligated to disclose McClain's inexperience in designing and constructing beef processing facilities, as the disclosures at issue were not otherwise so incomplete as to mislead investors. See Brody, 280 F.3d at 1006; Blackman, 910 F.2d at 16.  As the challenged statements and omissions from the September 25, 2002 press release, the October 4, 2002 press release, and the November 14, 2002 SEC filing are not actionable under the securities laws, the Pennexx Defendants' Motion to Dismiss is granted in this respect.

Lead Plaintiff also challenges statements made in Pennexx's press releases of January 30, 2003 and March 31, 2003.  On January 30, 2003, Pennexx issued a press release announcing that it had raised $3.5 million of a board-approved $5 million private placement.  Queen was quoted in the press release as follows: "Having recently completed the installation of automated processing lines and renovation of our new state-of-the-art facilities, we welcome having the additional flexibility to fund our aggressive

growth plans."   (Am. Compl. ¶ 121.)   On March 31, 2003, Pennexx

issued a press release that included the following as a  "recent

highlight" for Pennexx:

> Moved  its operations to a 145,000 sqaure-foot
> facility in Philadelphia, PA, having reached
> full  capacity  at  the  40,000  square-foot
> Pottstown, PA facility in the first quarter of
> 2002.   Installed automated processing lines
> and state-of-the-art equipment, completed over
> 95% of the renovations of the facility, began
> training employees on the new equipment, and
> fine-tuned production processes.

(Id. ¶ 128.)   The March 31, 2003 press also quoted Queen as stating

that "2002 was a remarkable year of change and progress at Pennexx"

and that "[w]e now have the operational, financial and management

building blocks in place to realize the benefits of our leadership

position . . . ."   (Id.)   Queen further remarked as follows:

> With the expanded capacity, faster throughput
> and greater production efficiencies at our new
> facility, we can now expect to realize the
> benefits of our scalable business model, first
> by turning profitable and then by driving
> margin expansion through volume gains. We're
> clearly at an inflection point, given the
> positive momentum in the industry's rapid
> transition to case-ready meat and our capacity
> to take the company to the next stage of
> growth.

(Id.)

Lead Plaintiff argues that the press releases of January 30,

2003 and March 31, 2003 were misleading because Pennexx was

contemporaneously experiencing serious operating difficulties

caused by flaws in the design and construction of the Tabor

Facility.  Lead Plaintiff alleges that, as set forth in Queen's Declaration, Pennexx experienced serious operating difficulties in January 2003 as a result of the flaws in the design and construction of the plant.  (Id. ¶ 118.)  Lead Plaintiff further alleges that, as set forth in Pennexx's Cross-Claim:

> When Pennexx attempted to begin full production in January 2003 the real time production and inventory data system failed to work.  This system was vital to Pennexx's business model because it was to allow Pennexx to manage its production yield – the method by which pricing and profitability are managed in the meat processing business.  Rather than having real time information on meat yields that was critical to Pennexx's realization of operating efficiencies, Pennexx had to manage by manual calculation of monthly summary data.  Smithfield had directed that two scales from the old Pottstown plant be used in the new system rather than buying the new scales specified by the system manufacturer.  The old scales were unable to properly interface with the real time software – rendering the entire automated system useless. . . Pennexx repeatedly sought approval from Smithfield between January 2003 and May 2003 to purchase the proper scales . . . Despite Pennexx's repeated requests, Smithfield failed to approve Pennexx's request. . . . On January 28, 2003, the water pipe system at the [Tabor Facility] failed when the pipes froze and burst . . . [which] caused the ceiling in the raw material room to collapse only moments after Pennexx's employees had moved from the area.

(Id. ¶ 130.)  Jeffrey Muchow, who became Pennexx's Chief Operating Officer in April 2003 after serving as a consultant to the company for a period of time, advised that "[a]fter reviewing the ground beef lines in early 2003, I recognized that the design was improper

to achieve efficient results or product yields" and that "[b]ased on my 21 years of experience in meat processing, I believe that the Company's beef grinding lines is among the least efficient and poorly designed and engineered lay-outs I have ever seen."  (Id. ¶ 132.)  Donald Countryman, who was hired as Pennexx's Vice President of Quality Control in March 2003, investigated the Tabor Facility and found three principle design and engineering flaws: (1) the beef grinding lines had been improperly designed and engineered; (2) the yield program software created by Smithfield for the purpose of producing real-time yield data was flawed and failed to work; and (3) the case sealing and weighing systems were improperly designed and inadequate for the needs of the plant.  (Id. ¶ 131.)

In response, Defendants argue that the most plausible inference from Lead Plaintiff's own allegations is that Pennexx was not aware of the scope and severity of the operational problems caused by the defects in the plant until the late spring of 2003, after learning the observations of Muchow and Countryman, at which point Pennexx promptly disclosed these problems in its Form 10-QSB for the quarterly period ending March 31, 2003.  Specifically, Pennexx disclosed in its Form 10-Q, which was filed with the SEC on May 20, 2003, as follows:

> The three months ended March 31, 2003 was the first fiscal period in which the Tabor Avenue Facility was substantially complete. Operations during this period have been extremely disappointing.  Although certain labor efficiencies have been achieved, the

Company has experienced numerous unanticipated operating difficulties which have increased costs beyond management's expectations. In particular, the Company is finding that its meat yielding and tracking system is not performing as anticipated, with the concomitant result that meat yields are unsatisfactory and that the cost of meat as a percentage of sales is much higher than has historically been the case. In addition, the Company has identified several parts of the new equipment lines that are not working as had been anticipated. As a result, the Company has experienced labor costs in excess of those anticipated. As a result of these difficulties, and in particular as a result of the high cost of meat as a percentage of sales, the Company had virtually no gross profit in the March, 2003 quarter. This decline in gross profit ($1.5 million year over year) was made even more serious by the large increase in overhead expenses associated with operating the Philadelphia plant compared to smaller overhead expenses associated with operating the Pottstown plant.

***

The Company typically negotiates a price for each cut of meat with each customer based on the customer's needs. Because meat cost represents the highest percentage of cost of goods sold, meat yield (the ratio of the weight of meat shipped to the customer divided by the weight of the raw cuts from the weight of meat shipped to the customer divided by the weight of the raw cuts from the customer's meat was processed) is a major determinant of the Company's profit or loss. The Company recently identified a design flaw in the ground beef lines installed at the Tabor Avenue Facility. The design flaw has had the effect of reducing ground beef yield, and thereby increasing ground beef cost as a percentage of sales. Temporary steps have been implemented to reduce the effect of the flaw and a more permanent solution has been designed and order[ed]. If the Company

42

> survives, the replacement equipment (the aggregate cost of which is approximately $26,000), is expected to be installed by June 30, 2003 and is also expected to improve significantly the yield in the ground beef room.
>
> In addition, a second design flaw has prevented the Company from capturing critical real time yield data on all meat processed. This flaw allowed the operating inefficiencies to go undetected for approximately three months. Now steps have been taken to obtain more accurate data which, in turn, has allowed management to focus on the yield areas which need the most urgent attention. A complete overhaul of the current yield tracking system is currently being implemented.

(Smithfield Ex. 24, at 10-12.)

While Queen and Pennexx may well not have fully appreciated the scope and magnitude of the operational inefficiencies that resulted from flaws in the design, construction, and equipment of the Tabor Facility until April or May 2003, Lead Plaintiff has sufficiently alleged that Queen and Pennexx were, as of the issuance of January 30, 2003 press release, at least aware that the plant contained unanticipated design, construction, and/or equipment defects. Nevertheless, the disclosures in the January 30, 2003 press release misled the investing public to reasonably presume that the automated processing lines had been installed properly and were functioning as expected. Queen and Pennexx further misled the market by publicly confirming that the newly completed facility was, as promised in several prior press releases, in fact, "state-of-the-art." (See Am. Compl. ¶ 82

43

(quoting May 15, 2002 Press Release); ¶ 85 (quoting May 22, 2002 Press Release); ¶ 90 (quoting July 11, 2002 Press Release); ¶ 104 (quoting September 25, 2002 Press Release).)  Standing alone, this statement from the January 30, 2003 press release would likely constitute inactionable puffery.  However, given that Queen and Pennexx repeatedly used the term "state-of-the-art" throughout the securities class period as a catchphrase to raise anticipation for the completion of the Tabor Facility renovations, there is a substantial likelihood that its reiteration in the January 30, 2003 press release would assume actual significance in the deliberations of the reasonable shareholder.

The Court further finds that Lead Plaintiff has sufficiently alleged facts which, when viewed in the light most favorable to Lead Plaintiff, give rise to a strong inference of scienter by establishing circumstantial evidence of reckless misbehavior by Queen and Pennexx.  Pennexx had no immediate duty to make an affirmative disclosure upon first discovering flaws in the design, construction, and equipment of the Tabor Facility in January 2003. Pennexx could well have remained silent on the issue until the filing of its Form 10-Q on May 20, 2003, which would have given the company a full opportunity to investigate the defects in the plant and identify the resulting operational problems before releasing a public statement.  Instead, Queen and Pennexx elected to announce to the market, in a press release primarily addressing the

44

company's capital resources, that Pennexx had fulfilled its promise to shareholders of transforming the Tabor Facility into a "state-of-the-art" plant that boasted newly installed automated processing lines.[11]    Under the circumstances, the Court concludes that a reasonable factfinder could find that the challenged statements from the January 30, 2003 press release constituted an extreme departure from the standards of ordinary care and presented a danger of misleading buyers or sellers that is so obvious that Queen and Pennexx must have been aware of it.    Lead Plaintiff's allegations against Queen and Pennexx support an even stronger

---

[11] The Third Circuit has recognized that corporate officers have a duty to update "statements that, although reasonable at the time made, become misleading when viewed in the context of subsequent events." In re Burlington Coat Factory, 114 F.3d at 1431. "Courts in the Third Circuit have only found a duty to update statements . . . when the original statement concerned fundamental changes in the nature of the company, such as mergers or takeover attempts, and when subsequent events produced an extreme change in the continuing validity of that original statement." In re Home Health Corp. of Am., Inc., Civ. A. No. 98-834, 1999 WL 79057, at *18 (E.D. Pa. Jan. 29, 1999). Assuming, *arguendo*, that a duty to update applied to the statements made by Pennexx touting the Tabor Facility prior to its completion in January 2003, Queen did not breach any such duty. It is well-settled that "[c]orporate officers . . . have an obligation to be certain recently discovered adverse facts are accurate before making a corrective disclosures." In re MobileMedia Sec. Litig., 28 F. Supp. 2d 901, 937 (D.N.J. 1998). Thus, Queen and the other officers of Pennexx were obligated to conduct a full investigation into the deficiencies of the Tabor Facility before updating Pennexx's pre-2003 statements touting the plant. After having conducted such an investigation, Pennexx promptly updated those statements in the May 20, 2003 SEC filing. The duty to update misleading statements is, of course, distinct from the duty of a corporate officer or director to refrain from making false or misleading statements of material fact.

inference of scienter with respect to the challenged statements from the March 31, 2003 press release.  Indeed, Queen and Pennexx touted the capabilities of the newly renovated Tabor Facility with even greater enthusiasm in the March 31, 2003 press release, despite the ever-increasing likelihood that the defective plant would be unable to achieve the company's aggressive operational goals.  As the challenged statements from the January 20, 2003 and March 31, 2003 press releases are actionable against Queen and Pennexx under the securities laws, the Pennexx Defendants' Motion to Dismiss is denied in this respect.

### 3.    Termination of George Pearcy

Lead Plaintiff argues that Pennexx misstated or omitted material facts concerning the reason for the departure of George Pearcy, Pennexx's former CFO, and also underreported losses for the second quarter of 2002.  On August 14, 2002, Pennexx issued a press release announcing that Joseph Beltrami would be replacing CFO George Pearcy, who reportedly left Pennexx for "personal reasons." (Am. Compl. ¶ 93.)  Pearcy had been hired as Pennexx's CFO only three months earlier.  (Id. ¶ 92.)  Lead Plaintiff contends that, according to the verified wrongful termination lawsuit filed by Pearcy in the Court of Common Pleas for Montgomery County, Pearcy left Pennexx over a dispute with the other officers and directors of the company.  (Id. ¶ 94.)  According to Pearcy's lawsuit, Queen, McGreal,  and Dennis Bland,  Pennexx's Chief Operating Officer,

pressured Pearcy to underreport Pennexx's losses for second quarter 2002 to the SEC.  (Id.)  On numerous occasions, Pearcy was informed by Queen, McGreal, and Bland that he was permitted to report losses in the range of $800,000 to $1.2 million, but in no event was he to show losses in excess of $1.2 million.  (Id.)  In anticipation of the filing of Pennexx's Form 10-Q for the second quarter of 2002, Pennexx held a meeting on August 8, 2002, during which Pearcy reviewed his financial determinations and advised that he intended to disclose that Pennexx had suffered losses of $2.5 million during the second quarter 2002.  (Id.)  Upon hearing Pearcy's financial determinations, Queen left the meeting, refusing to accept the $2.5 million loss.  (Id.)  On August 12, 2002, Pearcy met with Queen, McGreal, and Bland and was given a letter that purported to terminate him for incompetence.  (Id.)  On August 13, 2002, Pearcy met with a Pennexx Director and the company's ad hoc audit committee and told them that the preliminary financial results showed a quarterly loss of approximately $2.5 million and that he had been directed by management to report a loss of no more than $800,000 to $1.2 million.  (Id.)  Pearcy's financial determinations were subsequently reviewed by the outside auditors of both Pennexx and Smithfield.  (Id. ¶ 95.)  On August 20, 2002, Pennexx filed a press release disclosing that the company had suffered a net loss of approximately $2.2 million for the second quarter of 2002.  (Id. ¶ 97.)  On April 1, 2003, Pennexx disclosed in its Form 10-K that

Pearcy had filed a wrongful termination lawsuit against the company alleging that he had been terminated for refusing to underreport losses. (Id. ¶ 95).

Lead Plaintiff argues that none of Pennexx's public releases and SEC filings from August 2002 through March 2003 disclosed any material facts regarding the dispute between the company and Pearcy and instead misled investors to be believe that Pearcy had left the company for personal reasons. The Court finds that Lead Plaintiff has sufficiently alleged that Pennexx's August 14, 2002 press release was misleading, inasmuch as the press release disclosed that Pearcy had left the company for "personal reasons." The company's misleading statement that Pearcy had left the company for personal reasons cannot be characterized as one that would be so obviously unimportant to an investor that reasonable minds could not differ on the question of materiality. Indeed, while the departure for personal reasons of a CFO who had only served for three months would not likely assume actual significance in the deliberations of the reasonable shareholder, a reasonable shareholder could well be concerned about the potential fallout from a high ranking official's termination for alleged "incompetence." See In re Numerex Corp. Sec. Litig., 913 F. Supp. 391, 401 (E.D. Pa. 1996)(noting that "the materiality of executive personnel changes must be gauged by the business circumstances of each case").

Lead Plaintiff has also sufficiently alleged facts giving rise to a strong inference that Pennexx acted with scienter in making the misleading statement, as knowledge of the alleged circumstances surrounding the termination of Pearcy for incompetence by Pennexx's directors and officers is imputed to the company. See Ballesteros Franco, 253 F. Supp. 2d at 728-29. Lead Plaintiff has not, however, sufficiently pleaded facts that demonstrate Queen was personally involved in the drafting and issuance of the August 14, 2002, or that he was otherwise aware of the misleading statements contained therein. See Ravens v. Republic New York Corp., Civ. A. No. 99-4981, 2002 WL 1969651, at *11 (E.D. Pa. Apr. 24, 2002)(noting that recent case law "reveals that a defendant may not be held liable under Section 10(b) and Rule 10b-5 for making a material misstatement (or omission) unless there are allegations which demonstrate that the particular defendant named in the complaint in fact made a misstatement or omission"). The Amended Complaint alleges only that Queen "had the ability to write [press releases], edit [press releases], prevent their dissemination in the first place or to cause them to be corrected shortly after their dissemination." (Am. Compl. ¶ 26.) It is well-established that such conclusory allegations fail to satisfy the rigorous pleading requirements of the PSLRA. The Court concludes, therefore, that the challenged statement from the August 14, 2002 press release, inasmuch as it misled investors to believe that

49

Pearcy had left the company for personal reasons, is actionable under Rule 10b-5 against Pennexx, but not against Queen. The Court further concludes that none of the challenged public releases subsequent to August 14, 2002 are actionable against Queen and Pennexx for failing to accurately disclose the reason for Pearcy's departure because none of public releases concerned Pearcy or his departure.[12]

Lead Plaintiff also argues that Queen and Pennexx misled investors by failing to disclose that the company was reporting losses ($2.2 million) that were less than those determined by Pearcy ($2.5 million). Assuming, *arguendo*, that this omission was material, Lead Plaintiff has not sufficiently alleged facts giving rise to a strong inference that Queen or Pennexx acted with scienter in reporting lower losses for the quarter. The Amended Complaint does not allege that any of the Defendants ever adopted Pearcy's estimate of the second quarter losses. See Nursing Home Pension Fund v. Oracle Corp., 242 F. Supp. 2d 671, 681 (N.D. Cal. 2002) (scienter allegations based on the opinions of certain employees do not establish that the defendants accused of making misstatements "thought the same thoughts"). Indeed, the more compelling inference from the facts alleged in the Amended Complaint is that the $2.2 million loss reported in the SEC filings

---

[12] The Court also notes that Pennexx timely disclosed the fact of Pearcy's lawsuit against the company, which was filed on October 22, 2002, in its Form 10-QSB for the 2002 fiscal year.

was based on the outside auditors' review of Pennexx's financials. As none of the challenged press releases and SEC filings are actionable under the securities laws for failing to disclose that Pennexx reported losses that were less than those determined by Pearcy, the Pennexx Defendants' Motion is granted in this respect.

### 4.    Pennexx's liquidity problems

Lead Plaintiff argues that Pennexx issued several press releases that misstated or omitted material facts concerning the company's severe liquidity problems.  However, a comprehensive review of Pennexx's press releases and SEC filings during the securities class period reveals that the company repeatedly disclosed the increasing severity of its liquidity crisis, as well as the potential consequences of its precarious financial position.

On March 29, 2002, Pennexx disclosed in its Form 10-KSB that, although the Smithfield transactions had addressed the Company's "chronic" undercapitalization, "if revenues do not increase sufficiently so that gross profit is sufficient to cover overheads, there is no assurance that the Smithfield transactions will provide sufficient capital for the Company to operate successfully." (Smithfield Ex. 25, at 17.)  Pennexx's Form 10-QSB for the first quarter of 2002, which was filed on May 15, 2002, disclosed that "[t]he Company's working capital decreased from $3.8 million at December 31, 2001 to $3.1 million at March 31, 2002, principally as a result of the purchase of property and equipment."  (Smithfield

51

Ex. 60, at 10.)  On August 19, 2002, Pennexx disclosed in its Form 10-QSB for the second quarter of 2002 that, primarily as a result of continuing net losses, "the Company ha[s] $1.2 million of cash (and cash equivalents), slightly less than half of the amount it had at December 31, 2001" and that "the Company's working capital decreased from $3.8 million at December 31, 2001 to $0.6 million at June 30, 2002."  (Smithfield Ex. 6, at 10.)  The August 19, 2002 filing warned that "[i]f the Company's losses continue, it will shortly deplete its remaining cash resources."  (Id. at 12.)  On September 25, 2002, Pennexx noted in a press release that the company "estimate[d] that [its] net loss for July 2002 approximated $1.2 million, and that the net loss for August 2002 approximated $0.3 million" and that it was considering ways to raise additional equity because "[s]uch an equity infusion would . . . improve the Company's liquidity[,] which has deteriorated due to the losses" from the move to the Tabor Facility.  (Smithfield Ex. 22.) Pennexx's Form 10-QSB for the third quarter of 2002, which was filed on November 14, 2002, disclosed that "the net loss for the [third quarter] of 2002 was approximately $2.2 million as compared to a net loss of $1.3 million for the third quarter of 2001," that "[b]y any measure, the Company had a shortage of liquidity at September 30, 2002," and that "[i]f the Company's losses continue, and the Company does not succeed in raising additional equity . . ., the Company will deplete its remaining cash resources."

52

(Smithfield Ex. 7, at 10-11.)  On April 1, 2003, Pennexx disclosed in its Form 10-KSB for the 2002 fiscal year that "[t]he net loss for the year ended December 31, 2002 was approximately $8.8 million . . . as compared to $2.7 million . . . for 2001" and that the Company "has been continuously unprofitable and has, therefore, continually been short of capital to finance its operations and sales growth."  (Smithfield Ex. 11, at 5, 11.)  The April 1, 2003 filing reiterated that "[t]he Company has been chronically undercapitalized," and further disclosed that "[m]anagement expects that losses will continue, on a reduced scale, into 2003 and that sales could increase substantially in such year as well.  The confluence of these two trends will exacerbate the Company's liquidity difficulty [such that] to continue funding day-to-day operations, the Company will need to raise funds from a potential equity offering, but there is no assurance that funds can be obtained on such a basis."  (Id. at 22.)  On May 8, 2003, Pennexx reported in a press release that it "had a net loss of $3.1 million in the three months ended March 31, 2003" and that it had "virtually depleted its cash resources."  (Smithfield Ex. 13.)  On May 20, 2003, Pennexx filed its Form 10-Q for the first quarter of 2003, in which the company disclosed that it had, in fact, "depleted its cash resources as of mid-May 2003" and reiterated that "to continue funding day-to-day operations, the Company will need to raise funds from a potential equity offering, but there is

no assurance that funds can be obtained on such a basis." (Smithfield Def. Ex. 24, at 15.)

As Pennexx timely disclosed the full nature and scope of its liquidity crisis, the challenged statements and omissions are not actionable under the securities laws. Accordingly, the Pennexx Defendants' Motion to Dismiss is granted in this respect.

### 5. Pennexx's default under Credit Agreement

Lead Plaintiff contends that Pennexx failed to timely and adequately disclose the company's increasing difficulty in complying with, and avoiding default under, the terms of the Credit Agreement with Smithfield. Despite Lead Plaintiff's allegations to the contrary, Pennexx repeatedly advised the market of its increasing risk of default under the Credit Agreement. On September 25, 2002, Pennexx issued a press release in which the company disclosed that it was seeking an equity infusion to "provide some additional protection against a potential default under the Company's Credit Agreement (with Smithfield Foods, Inc.), which requires the Company to maintain positive shareholders' equity." (Smithfield Def. Ex. 22.) The September 25, 2002 press release cautioned that "there is no assurance that such equity will be on terms acceptable to the Company," and noted that, as of August 31, 2002, the Company's shareholder equity was approximately $250,000. (Id.) Only one month earlier, the company's shareholder equity was over $1.7 million. (Smithfield Ex. 6, at 2.) On

October 4, 2002, Pennexx disclosed in a press release that Smithfield had agreed to an unconditional waiver of default under the Credit Agreement through October 30, 2002. (Am. Compl. ¶ 110.) On November 14, 2002, Pennexx's Form 10-QSB disclosed as follows:

> At September 30, 2002, the Company's shareholders' equity was not positive; however, Smithfield waived any defaults relating to compliance with the Net Worth Covenant to and including November 5, 2002, although Smithfield advised the Company that, in the future, it would insist on strict compliance with the terms of the Credit Agreement."

(Smithfield Ex. 7, at 15.) The November 14, 2002 filing noted that "[b]y virtue of having raised [$2.0 million in] equity capital on or before the expiration of the Smithfield waiver, the Company avoided a non-waived Event of Default under the Credit Agreement at November 6, 2002." (Id.) However, the filing acknowledged that "[i]f the Company were to have net losses subsequent to September 30, 2002 in an amount which exceeded $1.5 million (representing the difference between the equity raised . . . and the aggregate shareholders' deficit at September 30, 2002), the Company would again be in violation of the Net Worth Covenant," and expressly warned the market that "[m]anagement expects continuing losses into the fourth quarter of 2002." (Id. at 16.) The filing also disclosed the real prospect of Pennexx defaulting under the "Solvency Covenant" in the Credit Agreement. (Id. at 8.) On April 1, 2003, Pennexx disclosed in its Form 10-KSB for the 2002 fiscal

year that "the Company estimates its losses in the first quarter of 2003 will be between $1.8 million and $2.1 million, and management believes losses will continue into the second quarter as well." (Smithfield Ex. 11, at 24.)  Pennexx's Form 10-KSB further warned that "[i]f cumulative losses in the first six months of 2003 exceed $3.1 million, the Company will violate the shareholders' equity requirement of the Smithfield Credit Agreement at June 30, 2003." (Id.)

As  Pennexx timely disclosed the full nature and scope of the company's difficulties in complying with the terms of the Credit Agreement with Smithfield, the challenged omissions are not actionable under the securities laws.  Accordingly, the Pennexx Defendant's Motion to Dismiss is granted in this respect.

6.    Growing demand

Lead Plaintiff contends that Pennexx's misled the investing public to believe that demand for Pennexx's case-ready meat products was growing during the securities class period, as disclosed in the company's press releases of May 15, 2002, May 22, 2002, July 11, 2002, February 12, 2003 and March 31, 2003. However, Pennexx's SEC filings reveal that demand for its case-ready meat products did, in fact, consistently grow during the securities class period.  On April 1, 2003, Pennexx disclosed in its Form 10-KSB that "[s]ales for the year ended December 31, 2002 were $48.7 million which . . . represented an increase of

approximately $6.3 million over sales of $42.4 million in 2001. This increase was almost exclusively the result of the increase in the volume of products handled . . . ."  (Smithfield Ex. 11, at 20).  On May 20, 2003, Pennexx announced in its Form 10-Q that "[s]ales for the three-month period ended March 31, 2003 were $12.8 million, representing an increase of approximately $1.9 million or 17.4% over sales of $10.9 million from the corresponding period of 2002.  This increase was primarily the result of the increase in the volume of products handled . . . ."  (Smithfield Ex. 24, at 11.)  Lead Plaintiff does not challenge the accuracy of sales figures contained in Pennexx's SEC filings.  As the challenged press releases do not contain any false or misleading statements concerning the demand for Pennexx's case-ready meat products, the Pennexx Defendant's Motion to Dismiss is granted in this respect.

     C.   <u>Section 20(a) of the Exchange Act</u>

Defendants also move to dismiss Count II, in which Lead Plaintiff alleges that Smithfield and the individual Defendants violated Section 20(a) of the Exchange Act.  Section 20(a) imposes joint and several liability on any person who "directly or indirectly controls any person liable" under any provision of the Exchange Act, "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. §78t(a).  Plaintiffs alleging a Section 20(a) violation must plead facts

showing (1) an underlying violation by the company; and (2) circumstances establishing the defendant's control over the company's actions.[13]  La Fata v. Raytheon Co., 207 F.R.D. 35, 45 n.5 (E.D. Pa. 2002).  The heightened pleading requirements of Rule 9(b) do not apply to Section 20(a) claims.  In re U.S. Interactive, Inc. Sec. Litig., Civ. A. No. 01-522, 2002 WL 1971252, at *20 (E.D. Pa. Aug. 23, 2002) (citing In re Tel-Save Sec. Litig., Civ. A. No. 98-3145, 1999 WL 999427, at *6 (E.D. Pa. Oct. 19, 1999)); see also In re Enron Corp. Sec., Derivative & ERISA Litig., Nos. MDL-1446, Civ. A. No. H-01-3624, 2003 WL 230688, at *11 (S.D. Tex. Jan. 28, 2003) (concluding that Rule 8 notice pleading standard applies to Section 20(a) claims because "the legislative history behind the controlling person provision of both the 1933 and 1934 Acts indicates that Congress sought to reach persons who tried to evade responsibility under the common law of agency by standing behind the scenes and having 'dummies' under their control commit the primary violations" and "without discovery, it would be extremely difficult to know facts where the controlling person was hiding behind the controlled person").

---

[13] While Lead Plaintiff will also have to prove at trial that Smithfield and the individual Defendants were each "culpable participants" in the underlying fraud, Rochez Bros., Inc. v. Rhoades, 527 F.2d 880, 889-90 (3d Cir. 1975), "the 'overwhelming trend in this circuit' is that culpable participation does not have to be plead to survive a motion to dismiss." Jones v. Intelli-Check, Inc., 274 F. Supp. 2d 615, 645 (D.N.J. 2003) (quoting Derensis v. Coopers & Lybrand Chartered Accountants, 930 F. Supp. 1003, 1013 (D.N.J. 1996)).

The Amended Complaint contains the following allegations in support of Lead Plaintiff's Section 20(a) claim:

> Smithfield and the Individual Defendants possessed, directly or indirectly, the power to direct or cause the direction of the management of Pennexx, through their involvement in the financial matters of Pennexx, through their ownership of voting securities, through their status as controlling shareholder, by contract, and/or through their positions as senior officers and/or directors.
>
> Thus, Smithfield and the Individual Defendants, by virtue of their offices, directorships, stock ownership and specific acts were, at the time of the wrongs alleged herein and as set forth in Count I, controlling persons of Pennexx . . . . Defendants had the power and influence and exercised the same to cause Pennexx to engage in illegal conduct and practices complained of herein by causing the Company to disseminate the false and misleading information referred to above.
>
> The Defendants' position made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiffs and the Class.    Additionally, [Smithfield Chief Operating Officer] Pope personally wrote and rewrote some of the statements issued in Pennexx's name and caused material information to be omitted from such statements.

(Am. Compl. ¶¶ 191-193.)    These allegations are sufficient to establish that Smithfield, Queen, McGreal, and, prior to their resignations on January 24, 2003, Luter and Cole,[14] influenced and

---

[14] The Amended Complaint does not allege that Luter and Cole exercised any degree of control over Pennexx after their resignations from the Board of Directors on January 24, 2003. Accordingly, Luter and Cole cannot be held liable under Section

controlled Pennexx's actions.  See In re NUI Sec. Litig., 314 F.
Supp. 388, 417 (D.N.J. 2004) (finding that similar allegations
established that defendants were controlling persons and citing
several cases for support).  Moreover, the Court has already
concluded that the Amended Complaint states an underlying Rule 10b-
5 claim against Pennexx and Queen.[15]  As Lead Plaintiff has
adequately pled a Section 20(a) claim against Smithfield and the
individual Defendants, the Motions to Dismiss are denied with
respect to Count II.

    D.    Breach of Fiduciary Duty - Queen

    The Pennexx Defendants move to dismiss Count III, in which
Lead Plaintiff asserts a breach of fiduciary duty claim against
Queen.  The Amended Complaint alleges that, as an officer of
Pennexx, Queen stood in a fiduciary relationship to the Pennexx
shareholders and owed the Pennexx shareholders the duty of care,
diligence, and good faith.  (Am. Compl. ¶ 198.)  Lead Plaintiff
further alleges that Queen breached those fiduciary duties by, in
his capacity as an officer (President) of Pennexx, entering into a

_____

20(a) for any primary violations of Rule 10b-5 that occurred after
January 24, 2003.  See In re Valence Technology Sec. Litig., Civ.
A. No. 95-20459, 1996 WL 225010, at *3 (N.D. Cal. April 30, 1996).

    [15] The Court concludes that Lead Plaintiff has stated claims
against Queen as a primary violator under Rule 10b-5 and as a
controlling person under Section 20(a) only in the alternative, as
"[a] person cannot be both the controller and the controlled." In
re Regal Communications Corp. Sec. Litig., Civ. A. No. 94-179, 1996
WL 411654, at *4 (E.D. Pa. July 17, 1996).

Forbearance and Peaceful Possession Agreement ("Forbearance Agreement") with Smithfield on May 29, 2003, that provided for a broad and general release of Smithfield from liability for claims against Smithfield by both Pennexx and its stockholders. (Id.) Queen, in contravention of his fiduciary duties as a Pennexx officer, purported to cause Pennexx shareholders, who were not even a party to the Forbearance Agreement, to be stripped of their legal rights without their knowledge or consent and without authority to do so. (Id.)

"The applicable law governing the liability of officers and directors for their stewardship of the corporation i[s] the law of the jurisdiction of incorporation." Resolution Trust Corp. v. Cityfed Financial Corp., 57 F.3d 1231, 1236 n.5 (3d Cir. 1995), vacated sub nom. on other grounds, Atherton v. FDIC, 519 U.S. 213 (1996). As Pennexx was incorporated in Pennsylvania, Pennsylvania law applies to Lead Plaintiff's breach of fiduciary duty claim against Queen. Under Pennsylvania law, corporate directors owe fiduciary duties of care, diligence, and good faith "solely to the business corporation," and such duties "may be enforced directly by the corporation, or may be enforced by a shareholder, as such, by an action in right of the corporation and may not be enforced directly by a shareholder or by any other person or group." 15 Pa. C.S.A. § 1717. Thus, Lead Plaintiff does not have standing to bring a direct claim for breach of fiduciary duty against Queen,

who served as President, CEO, and  director of Pennexx during the fiduciary class period.  See Malmros v. Jones, Civ. A. 03-3489, 2004 WL 632726, at *3-*4 (E.D. Pa. Feb. 27, 2004) (noting that shareholders do not have standing to bring direct cause of action for breach of fiduciary duty under § 1717 and citing cases); Hubner v. Schoonmaker, Civ. A. No. 89-3400, 1991 WL 60594, at *2-*3 (E.D. Pa. April 9, 1991) (rejecting direct claim for breach of fiduciary duty against defendant who served as officer and director of corporation).  Accordingly, the Pennexx Defendants' Motion to Dismiss Count III of the Amended Complaint is granted.

   E.   Breach of Fiduciary Duty - Smithfield

The Smithfield Defendants move to dismiss Count IV, in which Lead Plaintiff asserts a common law breach of fiduciary duty claim against Smithfield.  The Amended Complaint alleges that, based on at least the following, Smithfield was a controlling shareholder of Pennexx thereby owing fiduciary duties to the non-controlling and minority shareholders: (a) Smithfield owned 50% of Pennexx's outstanding shares; (b) two of Smithfield's officers sat on Pennexx's Board of Directors; (c) Smithfield was Pennexx's primary lender and supplier; (d) Smithfield controlled the acquisition of, and renovations to, the Tabor Facility; (e) Smithfield participated in and prevailed at important meetings concerning the business and operations of Pennexx, the renovation of and equipment for the Tabor Facility; and (f) Smithfield exercised domination over

Pennexx through actual exercise of direction over corporate conduct. (Id. ¶ 202.) As a controlling shareholder of Pennexx, Smithfield owed the non-controlling/minority shareholders of Pennexx the duty of care, diligence, and good faith, requiring Smithfield to: (a) act to protect Pennexx's non-controlling/minority shareholders' interests; (b) act in the best interest of all Pennexx's shareholders; (c) refrain from pursuing any narrow self-interest in dealing with the property of Pennexx's non-controlling/minority shareholders; and (d) refrain from using its position of trust and authority for personal gain at the expense of Pennexx's non-controlling/minority shareholders. (Id. ¶ 203.) Smithfield breached its fiduciary duties owed to Pennexx's non-controlling/minority shareholders by: (a) depriving and usurping Pennexx's non-controlling/minority shareholders of their rights as Pennexx shareholders; (b) implementing and carrying out a scheme to improperly take over Pennexx, its business and its assets, without any Pennexx shareholder approval, consent or ratification, or any consideration to Pennexx's shareholders; (c) failing to protect Pennexx's non-controlling/minority shareholders' interests; (d) failing to act in the best interest of all of Pennexx's shareholders by improperly taking over Pennexx's business and assets, leaving Pennexx as a shell and unable to continue its business; (e) pursuing its narrow self-interest in dealing with the property of Pennexx's non-controlling/minority shareholders; (f)

63

using its position of trust and authority as a controlling shareholder and creditor for personal gain at the expense of Pennexx's non-controlling/minority shareholders; (g) proposing and executing the Pennexx/Smithfield Transactions in a manner to effectuate the transfer of Pennexx's business and its assets without shareholder approval, consent or ratification; (h) controlling, supervising, dictating, delaying and cutting corners with respect to the renovations to the Tabor Facility, so as to garner for themselves substantial benefits (the acquisition of substantial assets and business opportunities and the ability to overcharge for supplies) to the detriment, harm, monetary damage, and expense of Pennexx's non-controlling/minority shareholders who were left with a worthless investment in a shell corporation; (i) cheating Pennexx by shorting Pennexx on supplies and charging Pennexx above-market prices for such supplies via its subsidiary Moyer Foods. (Id. ¶ 204.)

The Smithfield Defendants argue that Lead Plaintiff's fiduciary claims against Smithfield are derivative of harm to Pennexx and therefore cannot be brought in a direct shareholder action. "It is well-settled that a shareholder, director, officer or employee does not have standing as an individual to bring an action against third parties for damages that are derivative of harm to the corporation." KBT Corp. v. Ceridian Corp., 966 F. Supp. 369, 373 (E.D. Pa. 1997) (citations omitted). An action is

64

derivative if the gravamen of the complaint is injury to the corporation or to the whole body of stock or property without any severance or distribution among individual holders, or if the action seeks to recover assets for the corporation or to prevent dissipation of corporate assets. John L. Motley Assoc., Inc v. Rumbaugh, 104 B.R. 683, 686 (E.D. Pa. 1989) (citations omitted). If the injury is one to the plaintiff as an individual shareholder, as where the action is based on a contract to which the shareholder is a party, or on a right belonging severally to the shareholder, or on a fraud affecting the shareholder directly, or if there is a duty owed to the individual independent of the person's status as a shareholder, the shareholder may assert a direct action on his own behalf. Zinman v. FDIC, 567 F. Supp. 243, 246 (E.D. Pa. 1983) (citations omitted). In determining whether a cause of action is individual or derivative, courts must look to the nature of the wrongs alleged in the body of the complaint, and not to the plaintiff's characterizations or stated intentions. United States v. Acorn Technology Fund, L.P., Civ. A. No. 03-70, 2004 WL 1803321, at *5 (E.D. Pa. Aug. 12, 2004).

Upon review of the allegations in the Amended Complaint, the Court concludes that Lead Plaintiff's breach of fiduciary duty claim against Smithfield is derivative in nature. The essence of Lead Plaintiff's claim in Count IV is that Smithfield engaged in self-dealing activities at the direct expense of Pennexx, which

ultimately resulted in a diminution in the value of the company's

stock.   See generally Cowin v. Bresler, 741 F.2d 410 (D.C. Cir.

1984) (holding that breach of fiduciary duty claim by minority

shareholder based on majority shareholders' "manipulation of the

business for their personal profit at the expense of the minority

shareholders" was derivative).   Indeed, the entire Fiduciary Duty

Class will be made whole if Pennexx, who has asserted a breach of

fiduciary duty claim in its Cross-Claim against Smithfield, obtains

compensation or restitution from Smithfield.[16]   Accordingly, the

Smithfield Defendants' Motion to Dismiss is granted with respect to

Count IV.[17]

_____

[16] Lead Plaintiff argues that, even if its breach of fiduciary
duty claim against Smithfield should have otherwise been brought
derivatively, a direct action is permissible where, as here, all of
the parties to dispute are before the court and the corporation is
no longer operating as a going concern.  In support of this novel
proposition, Lead Plaintiff cites an unpublished decision in which
the Delaware Chancery Court held that, even though a limited
partner's claims for breach of fiduciary duty against a general
partner are ordinarily derivative, "the distinction between direct
and derivative claims becomes irrelevant . . . where a partnership
is in liquidation and all non-defendant partners in the resulting
litigation constitute a uniform class of limited partners." In re
Cencom Cable Income Partnerships L.P. Litig., Civ. A. No. 14634,
2000 WL 130629, at *3  (Del. Ch. Jan. 27, 2000).  As the Smithfield
Defendants point out, however, Cencom involved a partnership and
the court was careful to note that  "[w]hen this dispute [between
investors in an enterprise and the entity controlling the affairs
of that enterprise] arises in the corporate context, the Court of
Chancery is well served by a highly developed body of common law
explaining  principles  that  govern  the  resolution  of  these
disputes." Id. at *2.  The Court concludes, therefore, that Lead
Plaintiff's reliance on Cencom is unpersuasive.

[17] The Court also denies Lead Plaintiff's request for leave to
amend Count IV.  As the Fiduciary Class did not suffer any injuries

66

F.    Successor Liability

The Smithfield Defendants move to dismiss Count VI of the Amended Complaint, in which Lead Plaintiff asserts that Smithfield and Showcase, a wholly-owned subsidiary of Smithfield, are liable for the acts of Pennexx under a theory of successor liability.  The Amended Complaint alleges that Smithfield took control over all of Pennexx's assets and transferred them to a Smithfield-owned corporation, Showcase, ending Pennexx's ability to continue its operations.  (Am. Compl. ¶ 213.)  Smithfield's Form 10-Q, filed on September 10, 2003, disclosed that Smithfield is "operating the [Pennexx] assets under the name Showcase Foods, Inc. as part of the [Smithfield] Beef segment."  (Id. ¶ 214.)  Smithfield did not sell Pennexx's assets, which included the Tabor Facility, the old equipment used by Pennexx in the Pottstown facility and the new equipment, receivables, and customers.  (Id. ¶ 215.)  Rather, it began operating Pennexx's business through the new Smithfield entity called Showcase.  (Id.)  Queen, who remained at the Tabor Facility for two weeks after Smithfield took over, testified during

---

that are separate and distinct from those injuries suffered by Pennexx, any amendment to the breach of fiduciary duty claim against Smithfield in Count IV would be futile.  See Shane v. Fauver, 213 F.3d 113, 115-117 (3d Cir. 2000) (dismissal without leave to amend is justified on grounds of futility, i.e., the amended claim would fail to state a claim upon which relief could be granted).  Furthermore, the Court grants the Smithfield Defendants' Motion to Dismiss Count V of the Amended Complaint, which asserts a claim against Luter and Cole for aiding and abetting Smithfield's breach of fiduciary duty.

his deposition that business continued as normal at the Tabor Facility on the day that Smithfield took over Pennexx; that there was an agreement that Smithfield made with Pennexx's largest customer whereby there would be no disruption in service; Smithfield continued doing business with all of Pennexx's customers; Smithfield kept, and continued to pay, certain of Pennexx's vendors, including the phone company, electric company and insurance policies; Smithfield continued to employ substantially all of the Pennexx employees; and Smithfield continued to use Pennexx's United States Department of Agriculture license.   (Id. ¶ 216.)   Smithfield also has continued to manufacture Pennexx's products, held itself out to the customers as a continuation of Pennexx and enjoyed the goodwill created by Pennexx's business.   (Id. ¶ 217.)   Smithfield has expressly or impliedly agreed to assume Pennexx's obligations, including $12.1 million of Pennexx equipment lease obligations, to facilitate the uninterrupted continuation of normal business operations of Pennexx.   (Id. ¶ 218.)   Smithfield and Smithfield's wholly owned corporation, Showcase, are merely a continuation of Pennexx and its business, constituting a *de facto* merger.   (Id. ¶ 219.)

As a general rule under Pennsylvania law, "when one company sells or transfers all its assets to another, the successor company does not embrace the liabilities of the predecessor simply because it succeeded to the predecessor's assets."   Philadelphia Electric

Co. v. Hercules, Inc., 762 F.2d 303, 308 (3d Cir. 1985).  Four exceptions to the general rule of nonliability are widely recognized in Pennsylvania.  Id.  A successor corporation may be held responsible for the debts and liabilities of its predecessor where: (1) the purchaser of assets expressly or impliedly agrees to assume obligations of the transferor; (2) the transaction amounts to a consolidation or *de facto* merger; (3) the purchasing corporation is merely a continuation of the transferor corporation; or (4) the transaction is fraudulently entered into to escape liability.  Id.  "A fifth consideration, sometimes included as an exception to the general rule, is where the transfer was without adequate consideration and provisions were not made for creditors of the transferor."  Id. (internal quotation omitted).

     The Smithfield Defendants argue that none of the enumerated exceptions to the general prohibition against successor liability are applicable in this case.  The Amended Complaint does, however, set forth allegations demonstrating the nature and basis for Lead Plaintiff's claim that Smithfield and Showcase are liable as Pennexx's successors in interest, which is sufficient to withstand a motion to dismiss.  See Central Nat. Gottesman v. Pemcor, Inc., Civ. A. No. 01-3203, 2001 WL 1198659, at *1 (E.D. Pa. Oct. 5, 2001) ("While defendants contend that the necessary . . . elements for imputing liability to a successor company are missing, these elements need not be established at this early stage.") (citing

69

Brown v. Philip Morris, Inc., 250 F.3d 789, 796 (3d Cir. 2001)). Accordingly, the Smithfield Defendants' Motion to Dismiss is denied with respect to Count VI.

IV.   CONCLUSION

For the foregoing reasons, the Motions to Dismiss filed by the Pennexx Defendants and the Smithfield Defendants are each granted in part and denied in part.   The Pennexx Defendants' Motion is granted with respect to Count I, except as to the claims against Pennexx based on the challenged statements and omissions from the August 14, 2002 press release, the January 30, 2003 press release, and the March 31, 2003 press release, and the claims against Queen based on the challenged statements and omissions from the January 30, 2003 press release and the March 31, 2003 press release; denied with respect to Count II; and granted with respect to Count III. The Smithfield Defendants' Motion is granted with respect to Counts I, IV, and V, and denied with respect to Counts II and VI.[18]

An appropriate Order follows.

_____

[18] In sum, the following claims survive the Motions to Dismiss:
1.   The Rule 10b-5 claims in Count I against Pennexx based on the challenged statements and omissions from the August 14, 2002, January 30, 2003, and March 31, 2003 press releases;
2.   The Rule 10b-5 claims in Count I against Queen based on the challenged statements and omissions from the January 30, 2003 and March 31, 2003 press releases;
3.   The Section 20(a) claims in Count II against Smithfield, Luter, Cole, Queen, and McGreal; and
4.   The successor liability claims in Count VI against Smithfield and Showcase.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THE WINER FAMILY TRUST      :    CIVIL ACTION
                             :
        v.              :
                             :
MICHAEL QUEEN, et al.      :    NO. 03-4318

**O R D E R**

**AND NOW**, this 27th day of September, 2004, upon consideration of the Smithfield Defendants' Motion to Dismiss the Amended Complaint (Doc. No. 36), the Pennexx Defendants' Motion to Dismiss the Amended Complaint (Doc. No. 37), the Lead Plaintiff's Response thereto (Doc. No. 50), and all attendant and responsive briefing, **IT IS HEREBY ORDERED** that said Motions are **GRANTED IN PART** and **DENIED IN PART** as follows:

1. The Pennexx Defendants' Motion to Dismiss is **GRANTED IN PART AND DENIED IN PART** with respect to Count I, and the claims against Pennexx, Defendant Queen, and Defendant McGreal in Count I are **DISMISSED**, except as to the claims against Pennexx based on the challenged statements and omissions from the August 14, 2002 press release, the January 30, 2003 press release, and the March 31, 2003 press release, and the claims against Defendant Queen based on the challenged statements and omissions from the January 30, 2003 press release and the March 31, 2003 press release.

2. The Pennexx Defendants' Motion to Dismiss is **DENIED** with

respect to Count II.

3. The Pennexx Defendants' Motion to Dismiss is **GRANTED** with respect to Count III, and that claim is **DISMISSED** in its entirety.

4. The Smithfield Defendants' Motion to Dismiss is **GRANTED** with respect to Counts I, IV, and V. The claims in Counts I, IV, and V are **DISMISSED** in their entirety.

5. The Smithfield Defendants' Motion to Dismiss is **DENIED** with respect to Counts II and VI.

BY THE COURT:

John R. Padova, J.

2